COMMONWEALTH VS. WENDELL C. STAMPLEY.

Plymouth. January 10, 2002. - July 18, 2002.

Present: MARSHALL, C.J., GREANEY, IRELAND, SPINA, COWIN, SOSMAN, & CORDY, JJ.

*Search and Seizure,* Automobile, Threshold police inquiry. *Threshold Police Inquiry. Constitutional Law,* Search and seizure.

At a hearing on a motion to suppress evidence obtained during a patfrisk conducted after the defendant was ordered out of a motor vehicle during a routine traffic stop, the judge erred in ruling that State troopers' search of the vehicle was unlawful, where the troopers' conduct of the stop was a measured response to the situation as it had gradually escalated, in which neither trooper issued an exit order or conducted a patfrisk based on a "mere hunch," but proceeded cautiously and issued the exit order only after what began as a "hunch" gradually acquired an objective basis for genuine concern. [325-330]

COMPLAINT received and sworn to in the Brockton Division of the District Court Department on December 16, 1998.

A pretrial motion to suppress was heard by *James F.X. Dinneen,* J.

After review by the Appeals Court, the Supreme Judicial Court granted leave to obtain further appellate review.

*William H. Connolly,* Assistant District Attorney, for the Commonwealth.

SOSMAN, J. The Commonwealth appealed from an order allowing the defendant's motion to suppress evidence obtained during a patfrisk conducted after he was ordered out of a vehicle during a routine traffic stop. In an unpublished memorandum and order pursuant to its rule 1:28, the Appeals Court affirmed the suppression order, concluding that there was no basis for ordering the defendant out of the car. *Commonwealth v. Stampley,* 52 Mass. App. Ct. 1103 (2001). We granted the Commonwealth's application for further appellate review. For the following reasons, we reverse the order granting suppression.

1. *Facts.*[1] While on routine patrol on Route 24 in Brockton at approximately 10:30 P.M., State Trooper Joseph Silva observed a passing vehicle with tinted headlights and taillights, in violation of State regulations. He signaled for the vehicle to pull over and stopped his own cruiser approximately twenty feet behind it. Immediately on stopping the car, and before he approached it or spoke with any of the occupants, all three occupants rolled down their windows and extended their arms outside, hands empty. Never having seen such a reaction to a traffic stop, Silva thought this was peculiar behavior, and radioed for backup. However, without waiting for backup to arrive, Silva approached the driver's side and asked the driver for his license and registration, both of which were promptly provided. From that vantage point, he noticed that the two passengers (the defendant in the front seat, the other passenger in the rear seat) did not have their seat belts fastened, in violation of G. L. c. 90, § 13A. He asked the passengers for identification. They both responded that they had no identification. Throughout this encounter, all three occupants of the vehicle kept their arms outstretched through the vehicle windows.

Silva returned to his cruiser to run a check on the driver's license and vehicle registration. While in his cruiser, he noticed that the defendant, seated in the front passenger seat, pulled his hands back into the vehicle, bent down out of sight for approximately thirty to forty-five seconds, then sat back up and thrust his arms out the window again. The check on the operator's license revealed that the license had been revoked. By then concerned about the defendant's movements in the car, Silva decided to wait for backup before proceeding.

When Trooper Rudy Torres arrived as backup, he also observed the three occupants of the vehicle with their hands outstretched. Silva explained to Torres what had occurred so far, recounting the defendant's bending over in the front seat, and asked Torres to keep close watch on the defendant while he, Silva, proceeded with the arrest of the driver. Torres stood at the back of the car while Silva placed the driver under arrest. As Silva was escorting the driver back to the cruiser, Torres

---

[1]The facts are as found by the motion judge, augmented by uncontested details from testimony offered at the suppression hearing.

observed the defendant again pull his arms back inside the vehicle, bend forward, and move his arms around "doing something underneath the front seat." After about fifteen seconds, the defendant sat upright and yet again thrust his hands outside the window. Remembering that Silva had described very similar conduct on the part of that same passenger, Torres became concerned that the defendant was either "hiding something" or "getting something" and decided to remove the defendant from the vehicle. Torres ordered the defendant out of the car, pat frisked him, and found an automatic pistol stuck in his waistband. Further search of the defendant uncovered an unspecified quantity of marijuana. Silva then checked underneath the front passenger's seat and found a clip with several rounds of .45 caliber hollow point ammunition.

The defendant was charged with carrying a firearm without a license (G. L. c. 269, § 10 [*a*]), carrying a firearm without a firearm identification card (G. L. c. 269, § 10 [*h*]), and possession of marijuana (G. L. c. 94C, § 34).

2. *Discussion.* In *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 662-663 (1999), *S.C.,* 432 Mass. 613 (2000), this court interpreted art. 14 of the Declaration of Rights of the Massachusetts Constitution to require that "a police officer, in a routine traffic stop, must have a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a driver out of a motor vehicle." See *Commonwealth* v. *Torres,* 433 Mass. 669, 673 (2001) (officers conducting stop for routine traffic violation may order driver or passenger to leave vehicle, "but only if they have a reasonable belief that their safety, or the safety of others, is in danger"). In so interpreting art. 14, however, the court emphasized that "it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns." *Commonwealth* v. *Gonsalves, supra* at 664.

"To determine whether such a belief [that the safety of the officers or the public is in danger] is reasonable, we ask 'whether a reasonably prudent man in the policeman's position would be warranted' in such a belief." *Commonwealth* v. *Torres, supra,* quoting *Commonwealth* v. *Vazquez,* 426 Mass. 99, 103 (1997). To establish the reasonableness of an officer's belief that

someone's safety is in danger during a stop, the Commonwealth is not required to make the specific showing that a driver or passenger has a weapon. "To support an order to a passenger to alight from a vehicle stopped for a traffic violation, therefore, the officer need not point to specific facts that the occupants are 'armed and dangerous.' Rather, the officer need point only to some fact or facts in the totality of the circumstances that would create in a police officer a heightened awareness of danger that would warrant an objectively reasonable officer in securing the scene in a more effective manner by ordering the passenger to alight from the car." *Commonwealth* v. *Gonsalves, supra* at 665, quoting *State* v. *Smith,* 134 N.J. 599, 618 (1994). We look, therefore, to determine whether there were facts and circumstances in the course of this particular traffic stop that, viewed objectively, would give rise to "a heightened awareness of danger" on the part of the trooper, *id.,* recognizing that law enforcement officials may have little time in which to avert "the sometimes lethal dangers of routine traffic stops." *Id.* at 671 (Fried, J., dissenting).[2]

The stop before us began as a routine stop for a technical vehicle equipment infraction. While the initial response of the occupants in thrusting their arms out the window was peculiar, it was not in any sense threatening to the trooper making the stop. Albeit unusual, the gesture of the occupants could be viewed as conciliatory, made to assure the trooper of their utmost cooperation. Silva noted the peculiarity of this behavior, and summoned backup, but proceeded to treat the stop as routine and did not issue any exit order at that stage of the encounter. As to the two passengers, the trooper immediately observed a violation of the seat belt law, for which he intended to cite them, and was then confronted with their assertions that neither of them had any identification. Still proceeding with a routine inquiry, Silva took the operator's license and registration back to his cruiser to run the standard check. At that point, however,

---

[2]The motion judge decided this matter a few months prior to the court's decision in *Commonwealth* v. *Gonsalves,* 429 Mass. 658 (1999), *S.C.,* 432 Mass. 613 (2000). In concluding that the exit order and search were improper because they were "not based on a reasonable fear for the officers' safety," the motion judge did not have the benefit of this court's articulation of the minimal threshold requirement for such an order.

he discovered that the driver did not have a valid license, and decided to arrest him for that offense, which would take the encounter well beyond a "routine" citation for a technical vehicle equipment infraction.

At the same time, Silva observed the defendant pull his arms into the vehicle and lean forward, a motion consistent with reaching to the floor or under the seat. Numerous cases have recognized that such gestures, suggestive of the occupant's retrieving or concealing an object, raise legitimate safety concerns to an officer conducting a traffic stop. See, e.g., *Commonwealth* v. *Torres, supra* at 674 (observation of passengers "bent over" and "messing with something" on floor of stopped vehicle suggested that "they might be concealing or retrieving a weapon"); *Commonwealth* v. *Moses*, 408 Mass. 136, 138, 140, 142 (1990) (passenger ducking under dashboard made officer reasonably suspect passenger was concealing weapon); *Commonwealth* v. *Prevost*, 44 Mass. App. Ct. 398, 401 (1998) ("justifiable concern for the safety of the officers" prompted by passenger's bending over briefly out of sight and trying to put on coat during traffic stop); *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 555, 556 (1996) (exit order would be justified by observation of passenger "bending forward as if to place an object under the seat in front of him" during stop for erratic driving); *Commonwealth* v. *Heughan*, 40 Mass. App. Ct. 102, 104-105 (1996) (rear seat passenger's bending down out of sight as vehicle stopped was "a motion that reasonably could be taken as placing or retrieving an object beneath the driver's seat"); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 312, 315 (1992) (observation that passenger bent forward "as if to place something on the floor" contributed to officer's justification for exit order and patfrisk); *Commonwealth* v. *Vanderlinde*, 27 Mass. App. Ct. 1103, 1104 (1989) (passenger reached into well between seats during stop for speeding; exit order lawful because officers "were justified in fearing that [the passenger's] purpose in reaching into the well might be to obtain a gun").[3] Moreover, this gesture occurred at the precise time the trooper

---

[3]The Appeals Court correctly noted that, in some of these cases, the officers' suspicions were based on multiple factors, not merely on the passenger's ducking down or bending over out of sight. See *Commonwealth* v. *Torres*, 433

was back in the cruiser and away from the vehicle, i.e., at a time when the defendant would likely have thought that he was no longer under observation. Immediately thereafter, he resumed the ostensibly conciliatory posture of sticking his arms out the window.

Despite the legitimate suspicions engendered by the defendant's movement in the car, Silva still proceeded in the normal course, merely waiting for backup to arrive before proceeding with the arrest of the unlicensed driver. While Silva was leading the arrested driver back to the cruiser, the backup trooper observed the defendant yet again bend forward "doing something underneath the front seat." It was only after that second observed incident of suspicious behavior that the trooper issued an exit order and conducted a patfrisk.

The Appeals Court, recognizing the low threshold set by *Commonwealth* v. *Gonsalves, supra,* and acknowledging that movements such as bending forward as if to reach under a seat may legitimately cause an officer to be concerned for his safety, nevertheless reasoned that there was no "immediate threat" at the time of the exit order because the defendant's hands were, once again, stretched outside the vehicle and visibly empty. The justification for an exit order does not depend on the presence of an "immediate threat" at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter. For example, as occurred in this case, certain conduct may cause an officer to become concerned that an occupant of a vehicle has access to a weapon. That the occupant is not reaching for a weapon at the exact moment of the

Mass. 669, 670-671 (2001); *Commonwealth* v. *Heughan,* 40 Mass. App. Ct. 102, 104-105 (1996); *Commonwealth* v. *Rivera,* 33 Mass. App. Ct. 311, 314-315 (1992). A form of behavior that is reasonably interpreted as suspicious may, in some cases, be corroborated by additional suspicious circumstances, but the absence of additional corroboration does not detract from the suspicious nature of the conduct itself. Indeed, other cases have found sufficient justification for an exit order based on little or nothing more than an occupant's bending or ducking briefly out of sight, or reaching in some direction. See *Commonwealth* v. *Prevost,* 44 Mass. App. Ct. 398, 401 (1998); *Commonwealth* v. *Vanderlinde,* 27 Mass. App. Ct. 1103, 1104 (1989). See also *Commonwealth* v. *Ellsworth,* 41 Mass. App. Ct. 554, 555, 556 (1996) ("no question" that such conduct justifies exit order, even though only conduct observed was one passenger "bending forward as if to place an object under the seat in front of him").

exit order does not lessen the danger posed by an officer's ongoing encounter with someone who may be armed, and we therefore do not require the split-second precision suggested by the Appeals Court's analysis. The fact that the defendant had resumed an ostensibly nonthreatening pose did not erase the suspicion engendered by his twice bending down toward the floor under the seat. In light of that repeated conduct, occurring precisely when the defendant would likely have believed he was not being so closely observed, the defendant's pointed display of seeming cooperation at times when he thought the troopers *were* watching him could reasonably be viewed as an attempt to lull the troopers into a false sense of security. If, in reality, the defendant was readying a weapon for prompt retrieval, the fact that he was again sticking his hands out the window would not reduce the danger inherent in the encounter.

The encounter was still an ongoing one, far from the point at which the troopers could avoid any safety risks merely by terminating the stop. Cf. *Commonwealth* v. *Ferrara*, 376 Mass. 502, 505 (1978) (exit order unlawful once valid license and registration produced, because there was "no need for further protective precautions" once purpose of stop accomplished); *Commonwealth* v. *Ellsworth*, 41 Mass. App. Ct. 554, 556-557 (1996) (despite passenger's suspicious movements, no justification for exit order where driver had already produced valid license and registration and had committed no traffic offense, because "there was no longer any reason to detain the occupants of the vehicle"). Once the operator's license was found to be invalid, the encounter escalated to an arrest of the driver, and Silva still legitimately intended to cite the two passengers for violation of G. L. c. 90, § 13A, a process that would be further complicated by the fact that they had no identification. Thus, the troopers needed to continue a legitimate stop, and to complete a variety of steps remaining in that stop, in the immediate presence of a possibly armed occupant of the vehicle. That the defendant's hands were outstretched and visibly empty at the instant the exit order was given did not change the troopers' legitimate concern that the ongoing encounter could prove dangerous if the defendant's earlier, repeated gestures had indeed involved a weapon.

Notable in this particular stop was the troopers' measured response to the situation as it gradually escalated. Based on Silva's initial observation of unusual behavior that gave rise to only a nonspecific concern, he first asked for backup. When he observed a gesture giving rise to more specific suspicions, he still merely asked the backup trooper to pay close attention to that particular passenger. It was only when the passenger repeated the same suspicious gesture that the trooper issued an exit order and conducted a patfrisk, and that order was directed solely at the passenger who had given both troopers cause for concern. Appropriately, neither trooper issued such an order based on a "mere hunch," *Commonwealth* v. *Torres*, 433 Mass. 669, 673 (2001), quoting *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974), but proceeded cautiously and issued the exit order only after what began as a "hunch" gradually acquired an objective basis for genuine concern. A measured response gauged to the precise unfolding of the encounter, rather than hasty reaction to the first ambiguous suggestion of possible trouble, is the hallmark of reasonableness on the part of officers conducting a stop. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 324 (2001).

3. *Conclusion.* The order allowing the defendant's motion to suppress is reversed, and the matter is remanded to the District Court for further proceedings consistent with this opinion.

*So ordered.*