COMMONWEALTH VS. MARTEL HORTON
(and a companion case[1]).

No. 03-P-1544.

Suffolk. January 10, 2005. - May 20, 2005.

Present: GREENBERG, DUFFLY, & GREEN, JJ.

Constitutional Law, Search and seizure. Search and Seizure, Automobile, Threshold police inquiry, Inventory. Threshold Police Inquiry. Firearms. Evidence, Firearm.

A Superior Court judge properly denied a motion by two criminal defendants (the driver and passenger of an automobile that a police officer had stopped for a motor vehicle violation) to suppress evidence of firearms and ammunition found after a second officer ordered the passenger to leave the vehicle and after a subsequent inventory search of the vehicle prior to its impoundment, where the exit order to the passenger was proper, in that the passenger's actions (reaching down below his leg and kicking at something) could be viewed as efforts to retrieve or conceal an object, which contributed to a reasonable apprehension of danger on the part of the police officers present [575-576]; and where the officer who stopped the vehicle contemplated impounding the car from the beginning of the traffic - stop, so that the inventory search was not a pretext to conduct further investigation of the car [576-577].

The evidence at a criminal trial was sufficient to convict the defendant of unlawful possession of a firearm, where the weapon was found on the floor of a motor vehicle, directly in front of where the defendant had been seated when police officers observed him reach below his leg and kick at something below the driver's seat in front of him. [577-578]

INDICTMENTS found and returned in the Superior Court Department on January 22, 2001.

A pretrial motion to suppress evidence was heard by Charles T. Spurlock, J., and the cases were tried before Barbara J. Rouse, J.

David H. Mirsky for Martel Horton.
Richard N. Foley for Fedly Jean-Charles.

[1] Commonwealth v. Fedly Jean-Charles.

*Hallie White Speight (Joseph M. Ditkoff,* Assistant District Attorney, with her) for the Commonwealth.

GREENBERG, J. Once again, we consider the constitutional limits on police when they order a driver or passenger of a motor vehicle, stopped for a motor vehicle violation, to leave the vehicle. See *Pennsylvania* v. *Mimms,* 434 U.S. 106, 109-111 (1977), which established that in a routine stop a police officer may order the driver out of a lawfully stopped vehicle as a matter of course. Contrast *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 662-663 (1999), holding that art. 14 of the Declaration of Rights of the Massachusetts Constitution requires reasonable suspicion of danger to the officer or others before a driver or passenger may be ordered from a lawfully stopped motor vehicle. See also the dissent of Justice Fried in *Gonsalves,* arguing for a "bright-line rule" permitting the police to order an occupant out of a lawfully stopped car, consistent with the Fourth Amendment standard giving more latitude to police in the field who must make rapid decisions in the context of potentially dangerous situations. *Id.* at 676-677. See *Commonwealth* v. *Vazquez,* 426 Mass. 99, 102-103 (1997); *Commonwealth* v. *Williams,* 46 Mass. App. Ct. 181, 183 (1999). We also consider whether a subsequent inventory search of the vehicle was permissible.

On the basis of the case law as developed, we are constrained to decide that the police in this case had a sufficient basis to order both defendants from the vehicle when they did and that the subsequent inventory search of the trunk of the vehicle was within permissible constitutional limits. The defendant Horton, who was the driver of the vehicle, and the defendant Jean-Charles, a passenger seated behind Horton in the rear of the vehicle, were both convicted at a jury trial in the Superior Court on gun and ammunition possession charges.[2]

1. *Facts and procedural background.* These are the facts found by the motion judge, supplemented by the uncontroverted

[2]Horton was convicted of one count of unlawful carrying of a large ammunition feeding device (G. L. c. 269, § 10[m]); two counts of unlawful possession of a firearm (G. L. c. 269, § 10[a]); and three counts of unlawful possession of ammunition (G. L. c. 269, § 10[h]). Jean-Charles was convicted of one count of unlawful possession of a firearm (G. L. c. 269, § 10[a]).

testimony of several police officers. See *Commonwealth* v. *Sweezey*, 50 Mass. App. Ct. 48, 49 (2000). At about 3:40 A.M. on November 14, 2000, Officer Edward Gately was in uniform and parked in his marked cruiser at the intersection of Quincy Street and Blue Hill Avenue in the Dorchester section of Boston when Horton, operating a brown 1989 Nissan Maxima automobile with an attached single license plate, drove into an all-night gasoline station at that location. Because Gately had made numerous stolen car arrests in that area, he checked the plate number to ascertain whether the vehicle had been reported stolen. A report from his motor data terminal indicated that the plate had been canceled, meaning that it could not legally be attached to another vehicle. On that basis, Gately activated the siren and blue signal lights on his patrol car and pulled over the Nissan. Besides Horton, the driver, there were two other persons inside the car, so Gately radioed for assistance and several officers responded within a few minutes. Gately then approached the driver's side and asked Horton for his operator's license. Returning to his patrol car, Gately entered the information into his motor data terminal and learned that Horton's license was valid and that there were no outstanding warrants for his arrest. Everything had occurred without incident up to this point.[3]

By this time, at least seven officers had arrived at the scene, and five remained to assist Gately. They parked their patrol cars around the Nissan and waited while Gately returned to question Horton about the vehicle's invalid license plate. By then, Gately had decided to return Horton's valid license and arrange to have the vehicle towed and thus to conduct an inventory search.

While Gately was conducting the activities so described, other officers positioned around the car became alarmed by Jean-Charles's movements in the back seat. The motion judge found that "Officer Guilfoyle observed that . . . Jean-Charles was moving in the rear seat and was tucking something under his leg." He was observed to be raising and lowering his hands

---

[3]There is also testimony from Gately and other officers indicating that sometime before the eventual inventory search Gately copied the vehicle identification number from the windshield and from that information received a report that the vehicle was unregistered and uninsured, but the timing of this is never precisely explained upon either direct or cross-examination.

and kicking something under the front seat of the car. For their safety, one of the other officers asked Jean-Charles to get out of the vehicle. After this was done, the officer returned to the car and observed a .25 caliber handgun on the floor of the car, where Jean-Charles's feet had been. The handgun contained one round of ammunition. These findings of fact are supported by the record.

The motion judge found that all three occupants of the car were arrested after the handgun was seized, but the evidence at the motion hearing indicated that the arrests were staggered. The defendant Jean-Charles's arrest apparently took place when the police asked him to get out of the car and then found the handgun. Next, according to Gately's testimony, the front seat passenger was arrested because a radio dispatcher indicated that there was an outstanding warrant for his arrest. Contrary to the judge's findings, Gately testified that Horton was not under arrest at that time.

After removing all three occupants from the car and arresting two of them, the police conducted an inventory search of the car in preparation for towing. They searched the trunk and found an unlocked, but zipped, bag. They seized a nine millimeter handgun in the bag along with mail addressed to Horton. Gately testified that after completion of the search of the trunk, and the seizure of the nine millimeter handgun, Horton was placed under arrest.

In sum, the evidence challenged in this case was discovered and seized in two distinct phases. First, police found the .25 caliber handgun containing one round of ammunition on the floor of the car after Jean-Charles was removed from the rear passenger section on the driver's side. Second, police found the nine millimeter handgun and its associated clips and feeding device in the bag when they conducted an inventory search of the trunk. The defendants argue that (1) the order given to Jean-Charles to leave the vehicle was unjustified so the first gun should have been suppressed, and (2) the subsequent inventory search was a pretext to conduct an investigation after the first gun was found, so the evidence discovered then should also have been suppressed. Jean-Charles also argues that his motion for a required finding of not guilty should have been allowed.

2. *The order to leave the vehicle.* The crucial fact, as the motion judge found, is that Jean-Charles reached down below his leg and kicked at something. Reaching under one's leg and kicking at something on the floor are movements that Massachusetts courts have said could be viewed as efforts to retrieve or conceal an object, which contributes to a reasonable apprehension of danger. See *Commonwealth* v. *Stampley*, 437 Mass. 323, 327 (2002) (holding that an exit order and patfrisk were justified when a passenger in a stopped vehicle leaned forward in a motion consistent with reaching to the floor, which suggested retrieving or concealing something and raised legitimate safety concerns); *Commonwealth* v. *Vanderlinde*, 27 Mass. App. Ct. 1103, 1104 (1989) (police were reasonable in the belief that their safety was in danger when the suspect in a car pulled over after a chase reached into the "well" between the driver's seat and that of the passenger); *Commonwealth* v. *Rivera*, 33 Mass. App. Ct. 311, 315 (1992) (fact that the defendant bent forward, as if to place something on the floor, as the trooper approached the car could be considered as a factor in the search of the person sitting near a visible baseball bat); *Commonwealth* v. *Heughan*, 40 Mass. App. Ct. 102, 104-105 (1996) (holding a police search reasonable partly because, as the driver pulled over, a back seat passenger bent down as if replacing or retrieving an object under the front seat); *Commonwealth* v. *Prevost*, 44 Mass. App. Ct. 398, 401 (1988) (holding an officer's concern for safety justifiable where a passenger bent out of the officer's sight and attempted to put on his coat as if to conceal something). Contrast *Commonwealth* v. *Holley*, 52 Mass. App. Ct. 659, 664 (2001) (ruling that an upward motion toward the visor was not a strong factor in support of a reasonable belief that safety was in issue, pointedly distinguishing it from a downward movement toward the floor which would better support a belief that safety was in issue); *Commonwealth* v. *Hooker*, 52 Mass. App. Ct. 683, 687 (2001) (finding an exit order was impermissible where the defendant merely moved his shoulders and appeared nervous; the court specified that the defendant "did not duck out of sight, lean forward, or move back and forth in his seat").

Other factors, which on their own would not justify an exit order, contribute to a determination that the exit order was

justified. The stop took place in the middle of the night in a high crime area. This fact "does not allow the police, without more, to order a [person] out of a vehicle or to conduct a pat-frisk," but "[t]he character of the neighborhood as a high-crime area is a relevant factor in determining whether there is reasonable suspicion of a threat to the officer's safety." *Holley*, 52 Mass. App. Ct. at 663, citing *Commonwealth* v. *Cheek*, 413 Mass. 492, 496-497 (1992). In addition, Jean-Charles looked rapidly side to side at the officers. That he looked at the officers does not by itself justify an exit order, *Hooker*, 52 Mass. App. Ct. at 686-687, but when viewed together with his hand movements, might have reasonably have contributed to an apprehension that he was hiding or retrieving something. Since we determine the order was justified by factors that gave rise to a reasonable suspicion of danger, the .25 caliber gun discovered when officers looked into the car after Jean-Charles's removal was properly admitted in evidence.

3. *Inventory search.* The defendants argue that the police decided to impound the car after the first gun was discovered and that "the purported inventory search was a pretext for an investigatory search." An inventory search conducted as a pretext for a general investigatory search violates the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights. See *South Dakota* v. *Opperman*, 428 U.S. 364, 376 (1976); *Florida* v. *Wells*, 495 U.S. 1, 4 (1990); *Commonwealth* v. *Matchett*, 386 Mass. 492, 510 (1982).

The Commonwealth argues that the impoundment was not a pretext for investigation but rather was inevitable because the car did not have valid plates, registration, or insurance.[4] Such a nonpretext inventory search, conducted according to written

---

[4] "The Commonwealth has the burden of establishing that this was a lawful inventory search." *Commonwealth* v. *Peters*, 48 Mass. App. Ct. 15, 20 (1999). An inventory search is legitimate only if (1) "the impoundment of the vehicle leading to the search meets constitutional strictures"; and (2) "the conduct and scope of the search itself meets constitutional strictures." *Commonwealth* v. *Ellerbe*, 430 Mass. 769, 772-773 (2000). The conduct and scope of this search is not at issue because it permissibly included the vehicle's trunk, *Commonwealth* v. *Garcia*, 409 Mass. 675, 684 (1991); it permissibly included closed but unlocked containers in the trunk, *Commonwealth* v. *Caceres*, 413 Mass. 749, 755 (1992); and the record contains a detailed three-page motor

procedures as part of the lawful towing of an unregistered, uninsured vehicle, would be permissible. Even the fact that the police might have suspected that the inventory search could turn up more weapons does not make it an impermissible pretext search. See *Commonwealth* v. *Garcia,* 409 Mass. 675, 679 (1991), and cases cited.

Our review of this issue is complicated because the motion judge never made any findings as to whether the vehicle was, in fact, destined to be towed from the beginning of the stop. Instead, he disposed of the impoundment issue by relying on his erroneous finding of fact that Horton was arrested before the search, reasoning that towing was then necessary because there was no one left to drive the car. Even so, based on the record before us, and considering the fact that the motion judge credited the testimony of the officers who testified at the motion hearing, we affirm the denial of the motion to suppress.

The record in this case permits us to find that impoundment was contemplated from the beginning of the traffic stop. When the findings of a motion judge are not adequate to support his conclusions of law, an appellate court can make its own findings to support the motion judge's conclusions of law. See *Bruno* v. *Bruno,* 384 Mass. 31, 35-36 (1981); *In the Matter of Jane A.,* 36 Mass. App. Ct. 236, 240 (1994).

At the motion hearing, Gately testified on direct and cross-examination that he intended to tow the car all along, as is standard practice for cars without valid plates. The Commonwealth adduced similar testimony from another officer that it is standard practice to tow such vehicles. It is apparent from the motion judge's findings that he found the officers' testimony credible. This evidence allows us to conclude that the impoundment was contemplated from the beginning of the stop, and not simply a pretext to conduct further investigation of the car.

4. *Denial of Jean-Charles's required finding of not guilty.* Jean-Charles contends that there was insufficient evidence to

vehicle inventory search policy promulgated by the Boston police department on October 23, 1991, conforming with *Commonwealth* v. *Bishop,* 402 Mass. 449, 451 (1988). Impoundment of uninsured, unregistered vehicles with attached plates is typically proper, see *Commonwealth* v. *Daley,* 423 Mass. 747, 750 (1996); therefore, the only question as to the propriety of the impoundment is whether it was a pretext.

sustain his conviction on the gun possession charge and that the trial judge incorrectly denied his motion for a required finding of not guilty. The question upon appeal is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Commonwealth* v. *O'Connell*, 438 Mass. 658, 661 (2003) (emphasis in original).

Jean-Charles argues that no rational trier of fact could have found that he "possessed" the .25 caliber handgun found on the floor of the car. We disagree. Although Horton had ammunition for a .25 caliber handgun on his person while Jean-Charles did not, other facts are enough for a reasonable trier of fact to conclude that Jean-Charles possessed the gun. He was seated in the back seat of the car on the driver's side. Several officers testified that they saw him reach below his leg, stretch his arms over his head, reach down again, and look side to side at the officers. One officer also testified that he saw Jean-Charles kicking at something below the driver's seat in front of him. When the police removed him from the car, they recovered the handgun partly protruding from under the driver's seat onto the floor area of the back seat, directly in front of where Jean-Charles was seated when he made the movements mentioned above. These facts are sufficient to support a finding that he had control of the gun. See, e.g., *Commonwealth* v. *Albano*, 373 Mass. 132, 135 (1977); *Commonwealth* v. *Sadberry*, 44 Mass. App. Ct. 934, 935-936 (1998). There was no error in denying Jean-Charles's motion for a directed verdict.

*Judgments affirmed.*