Agnes, Peter W., J.
INTRODUCTION
The defendant, Manuel Castro, is charged with trafficking in cocaine, a drug violation near a school or park, drug possession with intent to distribute, and two counts of possessing a firearm without a license. The defendant, Juan Carlos Sanchez, is charged with trafficking in cocaine and a drug violation near a school or park. They have both filed a motion to suppress evidence consisting of drugs in the glove box of a car where Castro and Sanchez were sitting. Castro also moves to suppress drugs, a gun and ammunition found at his house during a search to which he gave consent. Based on the credible evidence presented at the hearing on the motion to suppress, I make the following findings and rulings of law.
FINDINGS OF FACT
On October 30, 2002, Trooper Mark Blanchard (Blanchard) of the Massachusetts State Police was assigned to the Essex County drug task force. He received information from the Lawrence police department regarding an investigation into drug activity in the area of 66 Railroad Street in Lawrence. This area is known as a high crime area where individuals are frequently arrested for selling or possessing drugs.
Blanchard was familiar with the vehicle in this case because it was the subject of a separate and ongoing investigation of Castro. It was a blue Ford Taurus. Two weeks earlier, Blanchard executed a warrant at Castro’s house at 14 Archer Street in Lawrence as a result of controlled buys of drugs from that location by undercover agents. Blanchard actually submitted the affidavit for the warrant for the search of drugs, but it did not contain any information about firearms or ammunition, nor were they found during the search. Although no drugs were found at 14 Archer Street either, sources advised Blanchard that Castro had a hidden stash of drugs and money that “no one would ever find.” The blue Ford Taurus was the vehicle involved in those controlled buys. Additionally, Blanchard talked to Castro before October 30 about Castro’s interest and skill in the martial arts. These conversations were in English and Blanchard had no difficulty speaking or understanding Castro.
Blanchard arrived at 66 Railroad Street in time to observe Castro and Sanchez seated in the Taurus in the midst of what he testified he believed was a drug transaction. Castro was sitting in the driver’s seat and Sanchez in the passenger seat. Blanchard approached the driver’s side and his partner approached the passenger side. However, as he neared the car, what he actually saw was the movement of hands by Castro and Sanchez, but not movement that was like the movements made by a person who is reaching for something in a pocket or an area of the vehicle. The movements or gestures were not threatening or furtive. The court specifically finds that while Blanchard suspected that an exchange of drugs for money was occurring between the two defendants, he saw neither money nor drugs or any object exchanged between them prior to ordering Castro out of the car.
At this point, Blanchard asked Castro to exit the car and asked him if he had any drugs. Castro said, “No.” He was patted down, which was not done out of the concern for his personal safety. Blanchard felt a large object in Castro’s pocket. He removed a roll of United States currency in the amount of $500. Without Castro’s consent, they searched the glove box which revealed the presence of cocaine in excess of 14 grams. The defendants, at that point, were arrested and advised of their Miranda rights, after which they were transported to Lawrence for booking.
At the police station, Blanchard asked Castro if any drugs existed in his home. Castro said, “No,” and he gave both oral and written permission to search the house. Blanchard prepared a written consent form, read it to Castro and Castro signed it. The permission form is in evidence as exhibit 1.
Blanchard proceeded to 14 Archer Street accompanied by Castro. They used his keys to enter. Blanchard suspected that drugs existed under the floor. Castro cooperated and assisted Blanchard by removing floor tiles by heating them with a torch. Blanchard found two “hides” under the floor: one was empty, the other contained a nine-millimeter handgun, ammunition and cocaine.
RULINGS OF LAW
1. Exit Order
The test for determining whether an exit order is proper is “whether a reasonably prudent man in the *589 policeman’s position [had reasonable suspicion to believe] that the safety of the police or that of other persons was in danger.” Commonwealth v. Gonsalves, 429 Mass. 658, 661 (1999).[1] Reasonable fear for an officer’s safety has been established in a number of different contexts. Observing a weapon, for example, justifies an exit order. Commonwealth v. Robbins, 407 Mass. 147, 152(1990) (exit order proper where officer saw brown-handled object wedged in passenger seat and driver had just been arrested). The Commonwealth, however, is not required to make a specific showing that the driver or the passenger has a weapon. Commonwealth v. Stampley, 437 Mass. 323, 326 (2002). The Commonwealth need only “point to some facts in the totality of the circumstances that would create a heightened awareness of danger . . .” Id. For example, furtive movements by the defendant may be sufficient. Commonwealth v. Haskell, 438 Mass. 790 (2003) (police received a report that the defendant was seen loading a gun in a high crime area and at the scene the defendant was acting suspiciously; police also observed the defendant reach down); Commonwealth v. Moses, 408 Mass. 136, 138 (1990) (officer feared defendant had access to a weapon, was outnumbered by defendants, and one defendant upon making eye contact with the officer ducked under the dashboard); Commonwealth v. Horton, 63 Mass.App.Ct. 571, 575 (2005) (exit order proper where the defendant was seen moving in back seat tucking something under leg, raising and lowering hands, kicking something under the seat); Commonwealth v. Prevost, 44MassApp.Ct. 398, 401 (1998) (justifiable concern for safety prompted by passenger’s bending over briefly out of sight and trying to put on coat during traffic stop).
While many factors may be taken into account, “a ‘mere hunch’ is not enough, nor is nervousness or fidgeting.” Commonwealth v. Torres, 433 Mass. 669, 673 (2001) (evasive car maneuvering and a fleeing suspect with a backpack warrants an exit order). Other factors that might be relevant are the time of day when an exit order occurs, and whether the officers were in a high crime area. Horton, 63 Mass.App.Ct. at 576.
The Supreme Judicial Court has held that the justification for an exit order does not depend on the presence of an “immediate threat” at the precise moment of the order, but rather on the safety concerns raised by the entire circumstance of the encounter. Stampley, 437 Mass, at 328. Thus, an officer does not need to wait until a suspect is reaching for a weapon. Id. However, courts have only looked to factors that exist around the time of the exit order, and not information that was gained prior to the stop.
Here, no grounds existed for Blanchard to order the defendants out of the car. Blanchard only observed hand movements at the defendants’ laps. These gestures are not enough to justify an exit order. See Torres, 433 Mass, at 669. Blanchard testified that he suspected a drug transaction was occurring, but his subjective feeling does not support the object facts.[2] This is unlike a situation where the driver or the passenger ducks beneath the line of sight of the officer, or where the defendants appear to be reaching beneath them. See Haskell, 438 Mass, at 790; Horton, 63 Mass.App.Ct. at 575. Other considerations that could augment the Commonwealth’s case in establishing reasonable fear do not add much weight to their case. The exit order occurred during the day. However, the area was known as a high crime area which does cut in favor of the Commonwealth. Neither of these factors is dispositive, though. Horton, 63 Mass.App.Ct. at 576.
At no point did the officer testify that he feared for his safety. Although there is no case law to suggest that Blanchard’s prior encounter with the Castro can be taken into account when assessing whether Blanchard reasonably feared for his safety, even if it could be, his previous encounters involved drugs and a discussion of martial arts. Also, the previous search warrant only authorized a search for drugs, not weapons. This court finds that even if it were permissible to take these past contacts into account, a reasonable person would not fear for their safety. For the reasons stated above, the court finds that the police unlawfully ordered the defendants out of their car.
2. Exclusion of Evidence
Evidence obtained as a direct result of an unlawful police action must be excluded from evidence. Commonwealth v. Perrot, 407 Mass, 539 (1990).[3] With regard to the money and cocaine found directly after the illegal exit order, these are the fruits of an illegal action and therefore must be suppressed under the exclusionary doctrine.
The gun, ammunition and cocaine found as a result of a consensual search is not as clear cut. The exclusionary rule extends to both direct and indirect products of illegal police conduct. Commonwealth v. Balicki, 436 Mass. 1, 16 (2002), citing Wong Sung v. United States, 371 U.S. 471, 484 (1963). However, even when the circumstances would call for excluding evidence, the evidence may still not be subject to the exclusionary rule if the defendant’s consent to search his house and the unlawful conduct are “too attenuated.” Commonwealth v. Bradshaw, 385 Mass. 244, 258 (1982).
The notion of the dissipation of the taint attempts to make the point at which the detrimental consequences of illegal police action becomes so attenuated that the deterrent effect of the exclusionary rule no longer justifies its cost.
Commonwealth v. Damiano, 444 Mass. 444, 453 (2005), citing Brown v. Illinois, 422 U.S. 590, 609 (1975). Whether are not the circumstances are too attenuated, courts consider three factors: (1) the tem *590 poral proximity of the admission to the arrest; (2) the presence of intervening circumstances between the arrest and the admission; (3) the purpose and flagrancy of the official misconduct. Id.[4] The Commonwealth has the burden to establish that the consent is sufficiently attenuated from the illegal conduct. Id. at 454.
i.Time
The more time that elapses, the more attenuated the original taint becomes. See Commonwealth v. Fredette, 396 Mass. 455, 462 (1985) (5 months is too attenuated); Commonwealth v. Fielding, 371 Mass. 97, 114 (1976) (span of three hours, among other factors, indicated that the illegal conduct was too attenuated). Here, after Castro was ordered to exit and the drugs and money were found, he was immediately transported to the station for booking, which is when Castro signed the consent form. This factor standing by itself, then, cuts against the Commonwealth. However, in Commonwealth v. Damiano, the court found that the defendant’s consent was too attenuated when the consent was given at the police station and not at the time of his arrest, and that his consent was voluntary. 444 Mass, at 456. However, in Damiano, the defendant was lawjully arrested and the illegal action was a citizen’s eavesdropping on the defendant’ phone conversation.
Similarly, in Commonwealth v. Marquez, the SJC adopted the Supreme Court’s reasoning in New York v. Harris, 434 Mass. 370, 377 (2001). The court suppressed statements and evidence that were made at the time of a warrantless arrest. However, because the police had probable cause to arrest the defendant his statements made at the station were admitted. The existence of probable cause to arrest was determinative. Adopting the. language of New York v. Harris, the SJC wrote: “Where the police have probable cause to arrest a suspect, the Fourth Amendment’s exclusionary rule does not bar admission of a statement made by the defendant outside of his home ...” Id. An arrest in a home without a warrant but with probable cause does not render unlawful the continued custody of the suspect once he is removed from his house. Id. This language suggests that a defendant held without probable cause remains the product of an illegal detention. Based on this reasoning, it is clear that Castro’s arrest, initiated without probable cause, taints his consent to search. It was “an exploitation of the illegal [arrest]” and detention. Id. at 378.
ii.Intervening Factors
The presence of intervening circumstances may also support a finding that the defendant’s consent was too attenuated from Blanchard’s illegal conduct. See Fredette, 396 Mass, at 462 (events such as indictment, a second arraignment and being appointed counsel are sufficient intervening factors to not apply the exclusionary rule). In this case, Castro was taken directly to the police station for booking. This is not like the Maryland case where a defendant was illegally arrested, but the defendant’s wife consented to a search. See Miles v. State, 365 Md. 488 (2001). The court found that the wife’s consent was an intervening factor that made the contents of the search too attenuated from the illegal arrest. Here, however, no third party was involved.
iii.Flagrancy of Police Conduct
The facts indicate that the police acted prematurely, but not with a flagrant disregard of the law. Officer Blanchard knew that Castro had dealt drugs in the past and he saw movements by the defendants that he thought were indicative of drug dealing. However, without a reasonable fear for his safety, Blanchard could not order the defendants out of their car. Despite that the police action was not flagrant, the attenuation analysis is based on the totality of the circumstances. See Damiano, 444 Mass, at 457; citing Miles, 365 Md. at 530. This court holds that Castro’s consent to search his home was not too attenuated from the initial taint, the illegal exit order. Therefore, the cocaine, gun and ammunition must be suppressed as well.
ORDER
For the above reasons, the defendant’s motion to suppress is GRANTED.

The Supreme Court has held that the police may order a driver out of a car that has been stopped for a lawful traffic violation. Pennsylvania v. Minims, 434 U.S. 106, 111 (1977). Mimms was extended to approve similar exit orders to passengers of stopped vehicles. Maryland v. Wilson, 519 U.S. 408, 415 (1997). Massachusetts has not adopted this rule.

Often courts will note that “the association between drug dealing and guns is well known.” United States v. Beaudoin, 362 F.3d 60, 68 (1st Cir. 2004); see also Commonwealth v. Rodriguez, 415 Mass. 441, 451 (1993). Commonwealth v. Moses, 408 Mass. 136, 143 (1990); Commonwealthv. Va Meng Joe, 40 Mass.App.Ct. 449, 510 n. 13 (1996). However, in this particular situation, the officer had a relationship with the defendant and although he knew that the defendant dealt drugs, on none of the previous occasions did the officer mention that the defendant possessed a weapon. This is unlike other situations where officers approach a suspect whom they have no previous knowledge of and the courts permit the association of dmgs and guns to justify a Terry stop.

Notable exceptions to the exclusionary rule are the “inevitable discovery rule,” see Nix v. Williams, 467 U.S. 431 (1984); Commonwealth v. O’Connor, 406 Mass. 112, 115-116 (1989); the “independent source rule,” see Wong Sung, supra and lastly the “attenuation rule,” which will be discussed in the next section.

If statements are used at trial a fourth factor is observance of the Miranda rule subsequent to the unlawful arrest. See Damiano, 2005 Mass. 609. Since the Castro is not moving to suppress statements that he made, the court will not consider this factor.