NOTICE:  Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale.  Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent.  See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

23-P-1282

COMMONWEALTH

vs.

NATHANIEL GREENE.

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

The Commonwealth appeals from an order of a Superior Court judge allowing the defendant's motion to suppress.[1]  The evidence at issue is police body-worn camera (BWC) footage and observations of the defendant, Nathaniel Greene, after a vehicle stop and exit order.  Following an evidentiary hearing at which the responding officers testified, the judge found that the stop was lawful but allowed the motion to suppress as to the exit order, the patfrisk of the defendant, and a sweep of his vehicle.  We reverse.

_____

[1] A single justice of the Supreme Judicial Court allowed the Commonwealth's application, pursuant to Mass. R. Crim. P. 15 (a) (2), as amended, 476 Mass. 1501 (2017), for leave to pursue an interlocutory appeal in the Appeals Court.

Background.  We summarize the facts as found by the motion judge, supplemented with "evidence from the record that is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony . . . so long as the supplemented facts do not detract from the judge's ultimate findings" (citation and emphasis omitted).  Commonwealth v. Garner, 490 Mass. 90, 94 (2022).  At 1:21 A.M., members of the Boston police department (BPD) issued an alert for shots fired around the Dublin House (a bar) on Stoughton Street in the Dorchester section of Boston.  One minute later, police had confirmed at least one person had been struck.  Shortly after the initial burst of shots, there was a second volley of approximately fifteen more rounds.

At 1:27 A.M., BPD broadcast a description of a suspect based on an image retrieved from Department of Homeland Security (DHS) cameras in the immediate aftermath of the shooting.  The suspect was reported to be wearing a "dark blue jacket" and "blue jeans with faded legs," possibly carrying a gun, and running in the direction of Columbia Road.  The broadcast description did not contain any information as to the gender, race, height, or weight of the suspect.  The broadcast made no reference to cars fleeing the scene.

As two responding police officers were approaching the scene of the shooting, they saw a car (the defendant's) leaving

2

Stoughton Street, turning briefly onto Pleasant Street before turning right and accelerating onto a dead-end side street just south of the intersection of Stoughton and Pleasant.  As the car approached the dead end, it stopped and reversed all the way back to the main road before again heading south on Pleasant Street.  The dead-end street was approximately one-quarter of a mile from the Dublin House.[2]

A responding officer testified that the car caught his attention because it was the only car travelling away from the scene of the shooting at a high rate of speed.  The officer followed the defendant's vehicle on Pleasant Street for a short distance before activating his emergency lights; the car stopped without incident.  The stop was based on the speeding violation and the officer's concern that the car might contain a suspect, witness, or victim related to the shooting.  As the officer stopped his cruiser, BWC footage recorded the time as 1:28 A.M. (seven minutes after the initial broadcast reporting the shooting).

When the officer first approached the vehicle, he saw that the defendant, who was alone in the car, was wearing a dark shirt and gray-wash jeans, and noted a dark colored "bubble

---

[2] Stoughton Street intersects with Columbia Road on the northwestern end and Pleasant Street on the southeastern end. The Dublin House is the first building on the right when entering Stoughton Street from Columbia Road.

3

jacket" in the back seat.  The officer noted the clothing as being similar to the broadcast description of the suspect.

When the officer reached the vehicle, the defendant had in his hand what appeared to be his license and registration.  The officer asked the defendant where he was coming from, and the defendant said he had been at a club.  The officer told the defendant to shut off the car and the defendant complied.  The officer issued an exit order and, without pausing, opened the defendant's door.  The defendant asked why he was being ordered to get out of the car.  The officer explained that he was responding to a report of a shooting.

After the defendant got out of his car, he was pat frisked and moved to the rear of the car.  The defendant continued to protest the officer's actions and was not forthcoming when asked for specifics on where he had been before being stopped.  The officer inspected the front seat area, including inside the glove box and center console, and briefly looked in the back seat.  The examination of the vehicle was done quickly and did not involve any manipulation of the car's interior.  No contraband was recovered.  After the officers determined that the defendant was not the man in the DHS video, the interaction ended, and the defendant was allowed to leave.

The police later recovered a firearm near the scene of the shooting.  Security camera images connected a man to that gun.

4

The investigators compared those later-acquired images to the BWC footage of the defendant during the stop and concluded the defendant was the man who left the gun on scene. The identification rested primarily on the BWC footage of the defendant's lower body after the exit order, and these images, along with the officers' observations of the defendant once the car door was opened, were the subject of the motion to suppress.

Discussion. "When reviewing a motion to suppress evidence, we adopt the motion judge's subsidiary findings of fact absent clear error, but we independently determine the correctness of the judge's application of constitutional principles to the facts as found." Commonwealth v. Catanzaro, 441 Mass. 46, 50 (2004).

1. The exit order. "Our analysis begins with the validity of the exit order because there is no dispute that the initial stop of the defendant's vehicle was valid." Commonwealth v. Monell, 99 Mass. App. Ct. 487, 489 (2021). See Commonwealth v. Santana, 420 Mass. 205, 207 (1995) ("Where the police have observed a traffic violation, they are warranted in stopping a vehicle" [citation omitted]). An exit order is justified where the police "are warranted in the belief that the safety of the officers or others is threatened" or "have reasonable suspicion of criminal activity." Commonwealth v. Torres-Pagan, 484 Mass. 34, 38 (2020). We address both rationales.

5

"[I]t does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns . . . ." Commonwealth v. Gonsalves, 429 Mass. 658, 664 (1999). "The justification for an exit order does not depend on the presence of an 'immediate threat' at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter." Commonwealth v. Stampley, 437 Mass. 323, 328 (2002). "A police officer need point only to some fact or facts in the totality of the circumstances that would . . . warrant an objectively reasonable officer in securing the scene in a more effective manner." Commonwealth v. Rosado, 84 Mass. App. Ct. 208, 212 (2013).

Here, police officers saw the defendant only minutes after the shooting and a short distance from the scene, speeding away in a manner indicative of flight. As he approached the defendant's car, the testifying officer noted that the defendant's clothing matched the suspect's description. These facts caused "'a heightened awareness of danger that would warrant an objectively reasonable police officer'" to fear for his safety. Monell, 99 Mass. App. Ct. at 490, quoting Stampley, 437 Mass. at 326. "The exit order [was] a reasonable measure to prevent the harm that might have occurred as part of an attempt by [the defendant] to escape by car." Commonwealth v. Bostock,

6

450 Mass. 616, 622 (2008). Accordingly, the exit order was lawful.

The order was also justified by reasonable suspicion. For police to "expand a threshold inquiry of a motorist" stopped for a traffic violation, they "must reasonably believe that there is further criminal conduct afoot, and that belief must be based on 'specific and articulable facts and the specific reasonable inferences which follow from such facts in light of the officer's experience.'" Commonwealth v. Feyenord, 445 Mass. 72, 77 (2005), quoting Commonwealth v. King, 389 Mass. 233, 243 (1983). "In evaluating whether the police exceeded the permissible scope of a stop, the issue is one of proportion. The degree of suspicion the police reasonably harbor must be proportional to the level of intrusiveness of the police conduct" (quotation and citation omitted). Feyenord, supra. "[W]hen the police reasonably believe that a motorist has committed a crime, a motorist reasonably should expect that the police may engage in greater intrusions than when the motorist is suspected merely of a driving infraction." Bostock, 450 Mass. at 621.

Here, "the exit order was proportional to the suspicion that prompted the intrusion." Bostock, 450 Mass. at 622. The police were investigating a very recent shooting. The suspect was still at large. This "indicated a potential ongoing risk to

7

public safety, and therefore weighed in favor of reasonable suspicion." Commonwealth v. Evelyn, 485 Mass. 691, 705 (2020). See Commonwealth v. Depina, 456 Mass. 238, 247 (2010) ("The gravity of the crime and the present danger of the circumstances may be considered in the reasonable suspicion calculus").

The officers saw the defendant's vehicle speeding away from the area of the shooting minutes after it occurred, only one-quarter of a mile away. "Proximity is accorded greater probative value in the reasonable suspicion calculus when the distance is short and the timing is close." Commonwealth v. Warren, 475 Mass. 530, 536 (2016). Although the broadcast was of a suspect fleeing on foot in the opposite direction, this does not necessarily weigh against reasonable suspicion when the defendant could have gotten into a car and driven one-quarter of a mile in the time following the incident. See, e.g., Depina, 456 Mass. at 240, 247 (reasonable suspicion for stop where suspect reportedly fleeing on foot and defendant stopped pedaling scooter within three blocks of crime scene); Bostock, 450 Mass. at 617-619 (reasonable suspicion for exit order where defendant who matched witness description seen walking away from scene of car burglary and found minutes later in nearby truck).

When he first approached the vehicle, the testifying officer saw that the defendant's coat and jeans matched the description of the suspect at large. Combined with the timing,

8

proximity to the shooting, and observations about the defendant's driving, this gave the officer reasonable suspicion to believe that the defendant had recently engaged in criminal activity. "[T]he value of a vague or general description in the reasonable suspicion analysis may be enhanced if other factors known to the police make it reasonable to surmise that the suspect was involved in the crime under investigation." Commonwealth v. Meneus, 476 Mass. 231, 237 (2017). The officer was "permitted to take reasonable measures, such as ordering [the defendant] out of the vehicle . . . , to ensure that he did not attempt to escape before [the officer] could conduct a threshold inquiry." Bostock, 450 Mass. at 622.

2. The patfrisk and the protective sweep.[3] "[T]o justify a patfrisk, an officer needs more than safety concerns . . . ." Torres-Pagan, 484 Mass. at 37. "[P]olice must have a reasonable suspicion, based on specific articulable facts, that the suspect is armed and dangerous." Id. at 38-39.

"Where an officer has issued an exit order based on safety concerns, the officer may conduct a reasonable search for

_____

[3] The motion judge did not analyze the patfrisk because he ruled that the exit order was improper. Because we understand the patfrisk of the defendant to be relevant to the officers' ability to see the back of his pants, which was in turn relevant to the later identification of the defendant as the person who dropped the gun, we assess the legality of the frisk in the circumstances.

9

weapons in the absence of probable cause to arrest." Commonwealth v. Amado, 474 Mass. 147, 152 (2016). "We examine the facts not in isolation, but as they reasonably and objectively appeared in the context of the ongoing encounter." Commonwealth v. Rosado, 84 Mass. App. Ct. 208, 212 (2013).

Here, the facts that supported the exit order also supported the officer's suspicion that the defendant was armed and dangerous. See Commonwealth v. Narcisse, 457 Mass. 1, 9 (2010) (suspicions that individual committed crime and was armed and dangerous "may occur simultaneously"). The officers' concern for their safety grew when the defendant became argumentative and required repeated instruction to exit the vehicle. See Commonwealth v. Johnson, 82 Mass. App. Ct. 336, 340 (2012) (that defendant was nervous and slow to obey officers' commands were factors considered in reasonable suspicion analysis).

"Once the defendant was removed from the car and no weapon was discovered during the patfrisk of his person, the officers were justified in their concern that a weapon might remain in the car." Monell, 99 Mass. App. Ct. at 491. The BWC footage shows that both the patfrisk and search of the car were brief. "Such protective searches are reasonable if 'confined to what is minimally necessary to learn whether the suspect is armed and to disarm him once the weapon is discovered.'" Amado, 474 Mass. at

10

152, quoting Commonwealth v. Almeida, 373 Mass. 266, 272 (1977). The patfrisk of the defendant and sweep of his vehicle were justified, not prolonged, and appropriately limited.

<u>Order allowing motion to suppress reversed</u>.

By the Court (Englander, Hershfang & Brennan, JJ.[4]),

Clerk

Entered:  January 29, 2025.

---

[4] The panelists are listed in order of seniority.

11