## COMMONWEALTH vs. JESUS M. ROSADO.

No. 11-P-1778.

Hampden. May 10, 2013. - August 30, 2013.

Present: GRASSO, KANTROWITZ, & SIKORA, JJ.

*Search and Seizure,* Motor vehicle, Reasonable suspicion. *Constitutional Law,* Search and seizure, Reasonable suspicion. *Practice, Criminal,* Motion to suppress.

A District Court judge erred in allowing a criminal defendant's pretrial motion to suppress evidence discovered during a warrantless search of an automobile conducted when a police officer, after stopping the vehicle for lacking a front license plate and for having a nonilluminated rear license plate, observed what he believed to be a prohibited dangerous weapon (i.e., a nunchuck) in the vehicle, opened the door, and, despite his discovery that the item was in fact a bullwhip and not an unlawful weapon, secured the defendant in handcuffs in response to the defendant's continued ignoring of the officer's commands, where the safety measures employed by the officer were reasonable and proportional to the escalating risk he faced at each passing moment in the rapidly unfolding encounter. [212-216] SIKORA, J., dissenting.

COMPLAINT received and sworn to in the Holyoke Division of the District Court Department on January 3, 2011.

A pretrial motion to suppress evidence was heard by *Beth-zaida Sanabria-Vega,* J.

An application for leave to prosecute an interlocutory appeal was allowed by *Margot Botsford,* J., in the Supreme Judicial Court for the county of Suffolk, and the appeal was reported by her to the Appeals Court.

*Katherine E. McMahon,* Assistant District Attorney, for the Commonwealth.

*Merritt Schnipper* for the defendant.

GRASSO, J. Before us is the Commonwealth's interlocutory appeal from an order of a District Court judge allowing the defendant's motion to suppress evidence seized during a warrantless stop of a motor vehicle. After an evidentiary hearing at

which State Trooper David Pinkham was the sole witness, the judge concluded that Pinkham lacked constitutional justification to (1) open the door to the defendant's vehicle, (2) seize an item that was not an illegal weapon, and (3) remove the defendant from the vehicle and restrain him. We conclude that the judge erred in applying the law to the facts found and reverse.

1. *Background.* Charged with various drug and other offenses, the defendant moved to suppress the evidence seized during a motor vehicle stop that occurred in the early morning hours of January 2, 2011, in Holyoke. The defendant contended that Pinkham (1) impermissibly opened the door to his vehicle based on the observation of an item Pinkham believed was an illegal weapon, (2) improperly removed the defendant from the vehicle, and (3) used more force than the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights permit in a *Terry*-type stop.[1]

2. *Facts.* In reviewing a decision on a motion to suppress, "we accept the judge's subsidiary findings of fact absent clear error 'but conduct an independent review of [her] ultimate findings and conclusions of law.' " *Commonwealth* v. *Scott,* 440 Mass. 642, 646 (2004), quoting from *Commonwealth* v. *Jimenez,* 438 Mass. 213, 218 (2002).[2] The assessment of witness credibility is the exclusive province of the motion judge. See *Commonwealth* v. *Isaiah I.,* 448 Mass. 334, 337-338 (2007); *Commonwealth* v. *Ciaramitaro,* 51 Mass. App. Ct. 638, 639 (2001).

We recount the judge's factual findings, which mirror the testimony of Pinkham in all respects:[3]

"On January 2, 2011 at approximately 1:55 AM, Trooper

---

[1]See *Terry* v. *Ohio,* 392 U.S. 1, 21-22 (1968). Because the Fourth Amendment permits an exit order to a driver as a matter of course in a routine motor vehicle stop, see *Pennsylvania* v. *Mimms,* 434 U.S. 106, 109-110 (1977), we focus on the greater protections afforded under art. 14. See *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 662-663 (1999) (under art. 14, police must have reasonable belief that officer's safety, or safety of others, is in danger before ordering driver out of motor vehicle in routine traffic stop).

[2]Neither the Commonwealth nor the defendant takes issue with any of the facts found by the motion judge. The parties' dispute relates solely to whether, on the facts found, Pinkham's actions met constitutional strictures.

[3]We place in brackets those findings the judge relegated to footnotes.

David Pinkham, a Massachusetts State Police officer for five years, was on the drunk driving detail in Holyoke. He was patrolling southbound on Route 116 (Race Street) when he saw a motor vehicle (Acura coupe) driving northbound on Main Street without a front license plate. Trooper Pinkham proceeded to follow the Acura, at which point he saw that the motor vehicle's back plate was a 'red' plate. [If cars have a 'red' plate then by law they are to have a plate both in the back and in the front.] He also noticed the plate light was out. At this point, the Trooper activated his lights and pulled the motor vehicle over on Mosher Street.

"Once the car stopped, the Trooper noticed the driver's head duck out of sight for a moment and then re-appear. The Trooper left his spot light on in his unmarked cruiser lighting the Defendant's car. He approached the driver's side of the car and noticed the Defendant was smoking. He asked the Defendant to put out the cigarette, which the Defendant did. At this point, the Defendant told the Trooper he knew why he was being stopped — it was because he did not have an inspection sticker. [The Defendant claimed he had been stopped earlier in the day for that same problem.] While speaking with the Defendant, the Trooper noticed that the front license plate was actually on the driver side dash window. The Trooper explained why he had stopped the Defendant — missing front plate and the non-illuminated back plate.

"The Trooper asked the Defendant where he was coming from that night. As the Defendant answered the question (he was coming from his brother's house), he handed the Trooper his driver's license. At this point the Defendant leaned over to the glove box to retrieve the registration. While the Defendant was leaning over, the Trooper noticed either a wooden or leather handle in the area between the driver's door and seat. [There was no additional description given to the Court. No other 'identifying' marks consistent with a nunchaku[4] was [sic] seen. In fact, the Trooper stated on cross examination that he wasn't sure it

---

[4]See G. L. c. 269, § 10(*b*), inserted by St. 1975, c. 585, § 1, making it unlawful for a person to carry on his person, or under his control in a vehicle,

was a nunchaku and that is why he opened the door to retrieve the item and make a 'positive Id.'] Based on this quick visual, he believed that he saw a nunchaku, a per se dangerous weapon, but was not sure. The Trooper told the Defendant to put his hands on the steering wheel where he could see them. He had to tell the Defendant twice, as the first time he commanded it, the Defendant was in the process of handing over the car's registration. Once his hands were on the steering wheel, to further investigate precisely the item seen, the Trooper opened the car door and retrieved the 'weapon.' While opening the door, the Trooper saw the Defendant pull his right hand off the steering wheel and reach towards his right hip. The Trooper again told the Defendant to keep his hands on the wheel. The Trooper finally retrieved the item, which turned out to be a bull whip. He put the bull whip on the roof of the car, and told the Defendant to get out of the car all while physically escorting him out of the car. [The Trooper held the Defendant by the left arm as he was removing him from the car.]

"Once out of the car, the Defendant again tried to reach back with his right hand towards his right hip. The Trooper at this time told him to place his right hand on top of his head. Instead, the Defendant held his right arm up and away from his body. The Trooper again told him to put his right hand on his head. The Defendant complied. At this time, the Trooper noticed the Defendant's body started to tense-up. The Trooper increased his grip on his left arm and secured it in hand cuffs. He then took the Defendant's right arm and attempted to secure in the handcuffs, ultimately succeeding. As he was checking the tightness of the left handcuff, he could again feel the Defendant trying to reach to his right side. He noticed the Defendant had something cupped in his right hand. He told the Defendant to drop it, which he did. It was eight packets of heroin rubber banded together. At this point the Defendant was under arrest for heroin. A search incident to arrest was performed. In the car, the Trooper found 2 vials of lidocane

certain dangerous weapons, including, inter alia, "nunchaku, zoobow, also known as klackers or kung fu sticks." Case law often refers to nunchaku as "nunchucks." See, e.g., *Commonwealth* v. *Bush*, 71 Mass. App. Ct. 130, 131 (2008); *Commonwealth* v. *Carr*, 76 Mass. App. Ct. 41, 43 n.3 (2009). See also *Commonwealth* v. *Perry*, 455 Mass. 1010, 1010-1011 (2009).

[*sic*] commonly used as a cutting agent for cocaine, a box of about 50 pirated DVDs, and 80 packets of heroin. In the Defendant's back pocket $1,950.00 was found."[5]

3. *Discussion.* As we have noted in the past, analysis of events in the stop and frisk context "is not only fact intensive and time dependent, *Commonwealth* v. *Torres,* 424 Mass. 153, 163 n.8 (1997), but also interconnected and dynamic." *Commonwealth* v. *Ciaramitaro,* 51 Mass. App. Ct. at 642. We examine the facts not in isolation, but as they reasonably and objectively appeared in the context of the ongoing encounter. See *ibid.* We assess "whether there were facts and circumstances in the course of [the] particular traffic stop that, viewed objectively, would give rise to 'a heightened awareness of danger' on the part of the trooper, . . . recognizing that law enforcement officials may have little time in which to avert 'the sometimes lethal dangers of routine traffic stops.' " *Commonwealth* v. *Stampley,* 437 Mass. 323, 326 (2002), quoting from *Commonwealth* v. *Gonsalves,* 429 Mass. 658, 665, 671 (1999), *S.C.,* 432 Mass. 613 (2000). A police officer need point only to some fact or facts in the totality of the circumstances that would create a heightened awareness of danger as to warrant an objectively reasonable officer in securing the scene in a more effective manner. See *Commonwealth* v. *Gonsalves,* 429 Mass. at 665.

With these principles in mind, we consider the facts found by the judge. Here, Pinkham's observations that the vehicle lacked a front license plate and an illuminated rear license plate supported a stop of the vehicle for civil motor vehicle infractions, and the defendant does not claim otherwise. See *Commonwealth* v. *Santana,* 420 Mass. 205, 207 (1995); *Commonwealth* v. *Ciaramitaro, supra.* At the outset of that stop, and prior to its ordinary conclusion, Pinkham made observations that provided a specific and articulable factual basis to believe (1) the defendant was in possession of a nunchuck, a prohibited dangerous weapon, and (2) the weapon posed a safety threat. See *Com-*

---

[5]The defendant raised no challenge to the plain view seizure of the heroin that fell from his hand, his arrest, or the search of his person and vehicle and recovery of other evidence incident to that arrest. See *Arizona* v. *Gant,* 556 U.S. 332, 343-344 (2009); *Commonwealth* v. *Starkweather,* 79 Mass. App. Ct. 791, 796-797 (2011).

*monwealth* v. *Cruz*, 459 Mass. 459, 466-467 (2011) (exit order justified if police possess particularized suspicion of criminal activity or reasonable apprehension of danger). It was 1:55 A.M., Pinkham was alone, and prior to reaching the defendant's vehicle, he saw the defendant duck out of sight momentarily before reappearing. As he stood next to the vehicle, Pinkham saw a wooden or leather handle in the area between the driver's seat and door next to the defendant's leg. Based on his training and experience, Pinkham believed the item was a nunchuck, a prohibited dangerous weapon, as he had seen nunchucks fashioned similarly.[6] Given the dual concerns raised by these observations, Pinkham was fully justified in investigating further and securing any such weapons. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997); *Commonwealth* v. *Johnson*, 454 Mass. 159, 162 (2009). The police are "not required to gamble with their personal safety," *Commonwealth* v. *Robbins*, 407 Mass. 147, 152 (1990), and are entitled to take reasonable precautions for their protection. *Commonwealth* v. *Willis*, 415 Mass. 814, 817 (1993).

Contrary to the defendant's claim, Pinkham was not required first to inquire regarding the item rather than opening the door and removing it himself. See *Commonwealth* v. *Stephens*, 451 Mass. 370, 383-384 (2008). Neither the Federal Constitution nor the Massachusetts Declaration of Rights is so inflexible as to prohibit Pinkham from removing the weapon from the defendant's reach before ordering him to get out of the vehicle — especially when the item lay between the defendant and the driver's side door to the vehicle. Given the item's location and proximity to the defendant, Pinkham's assessment of the safest manner of securing it is a matter of judgment that we will not second guess. See *Commonwealth* v. *Stampley*, 437 Mass. at 328-329 (in analyzing danger posed during ongoing encounter with someone who may be armed, "split-second precision" not required); *Commonwealth* v. *Cabrera*, 76 Mass. App. Ct. 341, 350 (2010).

We do not agree with the motion judge that Pinkham's lack of certainty that the item was a nunchuck precluded him from

---

[6]Pinkham related, "I observed the handle of what I believed to be a nunchuck . . . or a similar type weapon like clackers. . . . I have seen nunchucks that were fashioned similarly to the handle which I observed."

opening the door to investigate further and secure it. Central to the judge's determination was her observation that Pinkham's testimony provided no additional description or identifying marks beyond the object's wooden or leather handle. The judge noted that Pinkham acknowledged "that he wasn't sure it was a nunchaku and that is why he opened the door to retrieve the item and make a 'positive [identification].' "[7] The governing standard is reasonable suspicion, not certainty, and the scenario encountered by Pinkham presented both a reasonable suspicion of criminal activity and a reasonable apprehension of danger. "While a mere hunch is not enough, . . . it does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order." *Commonwealth* v. *Gonsalves*, 429 Mass. at 664. Viewed from that vantage, we conclude that Pinkham's opening the vehicle's door to gain immediate access to what he believed was an illegal weapon was a reasonable and proportional measure necessary to confirm or dispel his suspicion and secure the weapon if necessary.

Pinkham's authority to investigate did not end when he opened the vehicle's door and discovered that the item was not a nunchuk, but a bullwhip. Although his discovery of this unusual item[8] dispelled the suspicion that the defendant was in possession of an unlawful weapon, when viewed together with the defendant's pulling his right hand off the steering wheel and reaching toward his right hip as Pinkham opened the vehicle's door, the discovery heightened rather than alleviated safety concerns. "The justification for an exit order does not depend on the presence of an 'immediate threat' at the precise moment of the order, but rather on the safety concerns raised by the entire circumstances of the encounter." *Commonwealth* v. *Stampley*, *supra* at 328. Pinkham had ordered the defendant to keep his hands on the steering wheel, and as Pinkham opened the

---

[7]We do not consider the judge's statement to be an adverse finding as to Pinkham's credibility but an erroneous view of the level of legal certainty required before Pinkham could permissibly open the vehicle's door. The judge explicitly found that Pinkham "believed that he saw a nunchaku . . . but was not sure."

[8]As Pinkham testified, the discovery of the bullwhip "heightened my concern that in the area of Holyoke you probably do not raise oxen or drive bull."

door, the defendant moved his right hand toward his right hip. "[C]ertain conduct may cause an officer to become concerned that an occupant of a vehicle has access to a weapon. That the occupant is not reaching for a weapon at the exact moment of the exit order does not lessen the danger posed by an officer's ongoing encounter." *Id.* at 328-329.

Nor did Pinkham's safety concerns end when he placed the bullwhip on the roof of the vehicle. Rather, the defendant's ignoring of Pinkham's commands to keep his hands on the steering wheel and his movement of his right hand toward his right hip necessitated escalating protective measures that were reasonable, measured, and proportional to the rapidly unfolding encounter. See *Commonwealth* v. *Sinforoso*, 434 Mass. 320, 323-324 (2001). We discern no disproportionality in Pinkham's escorting the defendant from the vehicle by holding his left arm. See *Commonwealth* v. *Johnson*, 454 Mass. at 163-164 (officers "not required to accept the risk of . . . ambiguity" posed by defendant's disregard of commands). Nor do we take issue with Pinkham's subsequent command that the defendant put his right hand on his head. That command was a reasonable and proportional response to the defendant's further attempt to reach back with his right hand toward his waist as Pinkham escorted him from the vehicle. See *Commonwealth* v. *Ciaramitaro*, 51 Mass. App. Ct. at 644, citing *Commonwealth* v. *Borges*, 395 Mass. 788, 794 (1985) (degree of intrusion on defendant must be proportional to degree of suspicion prompting intrusion). Given the defendant's continued ignoring of commands to keep his right hand on his head, his movement of his right arm up and away from his body, and his tensing of his body, Pinkham's securing the defendant in handcuffs was a reasonable and proportional measure for safely ascertaining whether the defendant had access to other weapons. Finally, the defendant's continued attempt to reach to his right side, even when in handcuffs, and Pinkham's observation that the defendant had something cupped in his right hand, supported his order for the defendant to drop what was cupped in his hand.

In sum, we view the safety measures employed by Pinkham to be reasonable and proportional to the escalating risk he faced at each passing moment in this rapidly unfolding encounter. See

*Commonwealth* v. *Willis*, 415 Mass. at 819-820; *Commonwealth* v. *Williams*, 422 Mass. 111, 117-119 (1996); *Commonwealth* v. *Pandolfino*, 33 Mass. App. Ct. 96, 98 (1992) ("use of cuffs, if necessary to accomplish a permissible inquiry, does not convert a *Terry* stop to an arrest"). We reverse the order allowing the defendant's motion to suppress evidence because we conclude, as matter of law, that Pinkham's actions, including his opening the door to the defendant's vehicle, his removal of the bullwhip and the defendant from the vehicle, and the subsequent protective measures he employed were reasonable and proportional to the risks encountered and permissible under art. 14. See *Commonwealth* v. *Rivera*, 67 Mass. App. Ct. 362, 366-367 (2006).

*Order allowing motion to suppress reversed.*

SIKORA, J. (dissenting). I respectfully dissent. After multiple readings of the police officer's direct and cross-examination at the suppression hearing, I conclude that not even the majority's masterful synthesis of accommodative doctrine can save that testimony from its cumulative implausibility.[1] I would respect the firsthand observations of the motion judge and affirm her resulting conclusion and order of suppression. An assessment of the entire record furnishes additional grounds for affirmance.

*Standard of review.* The standard of our review of a suppression order is settled black letter law. We accept the motion judge's subsidiary findings of fact unless they show clear error, but carry out an independent review of her ultimate findings and conclusions of law. See *Commonwealth* v. *Jimenez*, 438 Mass. 213, 218 (2002); *Commonwealth* v. *Scott*, 440 Mass. 642, 646 (2004). The ultimate findings nonetheless receive "substantial deference." *Commonwealth* v. *Carr*, 458 Mass. 295, 298 (2010), quoting from *Commonwealth* v. *Monteiro*, 396 Mass. 123, 131 (1985). The motion judge decides the credibility and weight of the evidence. See *Commonwealth* v. *Moon*, 380 Mass.

---

[1]The trooper's full testimony occupied sixty-three pages. As Appendix, I attach the main passage of his direct examination. At points in the following discussion, I will cite certain elements of his testimony under cross-examination.

751, 756 (1990); *Commonwealth* v. *Yesilciman*, 406 Mass. 736, 743 (1990). The duty of the appellate court is then to determine independently "the correctness of the judge's application of constitutional principles to the facts as found." *Commonwealth* v. *Mercado*, 422 Mass. 367, 369 (1996). Finally, the reviewing court may affirm a suppression decision on any ground supported by the record, even if neither the parties nor the judge relied on it below. See *Commonwealth* v. *Va Meng Joe*, 425 Mass. 99, 102 (1997); *Commonwealth* v. *Eggleston*, 71 Mass. App. Ct. 363, 367 n.4 (2008).

Under these standards, I find three independently adequate grounds for affirmance: the arresting officer lacked reasonable grounds (1) to open the car door, (2) to remove the defendant from the car, and (3) to handcuff and search him outside the car. At each stage he violated a constitutional standard. Any one of the violations requires suppression of the resulting evidence.

1. *Entering the car to search for nunchucks.* In addition to the findings recited by the majority, the motion judge rendered the following ruling in support of the suppression order.

> "There is no dispute that the Defendant was stopped for motor vehicle infractions, initially the missing front plate and unlit back plate. He was also charged with having no inspection sticker. The issue is whether the Trooper could open the car door and seize what was ultimately not a per se dangerous weapon and continue with the removal and search of the Defendant. I find the Trooper did not have the right to open the car door to further his investigation of the alleged weapon. The Trooper admittedly was not sure what the item was. He clearly stated all he saw was a handle, either wooden or leather. There were no distinguishing marks he testified to that would allow a reasonable person to state it was in fact a weapon. He should have issued the citation for the motor vehicle infractions, and let the Defendant leave.
>
> "For the foregoing reasons the Defendant's motion to suppress evidence is allowed."

This concluding language reemphasized the judge's earlier findings that Trooper Pinkham's "quick visual" glimpse of the

wooden or leather handle between the driver's seat and door left him "not sure" of the nature of the object attached to it. The judge found specifically, as the majority acknowledges: "There was no additional description given to the Court. No other 'identifying' marks consistent with nunchaku [were] seen. In fact, the Trooper stated on cross examination that he wasn't sure it was a nunchaku and that is why he opened the door to retrieve the item and make a 'positive Id.' " *Ante* at 210-211.

On direct examination by the prosecutor, the trooper's pertinent testimony consisted of the following:

> THE WITNESS: "At that time when I was looking down into the vehicle, I observed the handle of what I believed to be a nunchuck. It was, or a similar type weapon like clackers."
>
> DEFENSE COUNSEL: "I'm sorry. I didn't hear this."
>
> THE WITNESS: "Like clackers, nunchucks, zulu, clackers. It's the same."
>
> Q.: "Based on what you thought that that was a weapon?"
>
> A.: "Correct. Nunchuck is a dangerous weapon per se."
>
> Q.: "Okay. That's what you believed it was?"
>
> A.: "Correct. I have seen nunchucks that were fashioned similarly to the handle which I observed."
>
> Q.: "Okay. What did you do at this point?"

Cross-examination produced the following:

> Q.: "Now once you thought that you saw a nunchuck, that opinion was based on an observation of a wooden or leather handle, correct?"
>
> A.: "Correct."
>
> Q.: "You didn't know for sure that you were looking allegedly at a nunchuck?"
>
> A.: "No, I did not."

*Q.*: "You had a suspicion of that?"

*A.*: "It was not a positive identification of a nunchuck."

*Q.*: "So you decided that in order to make the positive identification, you opened the door?"

*A.*: "I decided that based upon there being a weapon of some nature there, that I would open the door."

*Q.*: "Well, to positively ID the weapon, you had to open the door?"

*A.*: "To identify what type of weapon, I would have to open the door."

*Q.*: "Did you ask [the defendant] what the object that you were concerned about was?"

*A.*: "No. I did not want him reaching for the object."

. . .

*Q.*: "In this situation you had what you thought was a dangerous weapon in the vehicle with [the defendant]?"

*A.*: "That's correct."

*Q.*: "You didn't at that point order [the defendant] out of the vehicle before opening the door?"

*A.*: "No."

*Q.*: "At that point, before you opened the door, you hadn't even identified what the handle was?"

*A.*: "Correct."

*Q.*: "At that point you didn't have probable cause to search the vehicle?"

*A.*: "I did not have probable cause to search the vehicle, no, I did not."

The prosecutor did not ask for, and the trooper did not offer,

any details of the basis for his suspicion. The judge received no information elaborating on his experience or familiarity with nunchucks[2] or similar weapons. At the outset of his testimony, he reported that he had received an eight-hour basic training block in dangerous weapons at the State Police Academy five years before the encounter with the defendant. He did not tie his suspicion in this case to the content of either his training or his specific experience. The judge heard nothing about the timing, frequency, or nature of that experience. Nor did the trooper specify any elements of the size, shape, color, or markings of the wooden or leather handle supporting his suspicion of its attachment to a prohibited inherently dangerous and somewhat exotic weapon.

Nor did the collateral circumstances support his particular suspicion. The stop did not occur in a "high crime area." No dispatch information reported any criminal events or connected the defendant's vehicle to any investigation. The stop rested on civil vehicular infractions. The defendant exhibited no verbal or physical hostility toward the trooper. He appropriately provided his license and registration. He had no objects in his hands. He made no movements toward the floor.

Under the standards of both the Fourth Amendment to the United States Constitution and art. 14 of the Massachusetts Declaration of Rights, in order to detain a motorist after a routine traffic stop and his production of a valid driver's license

---

[2]General Laws c. 269, § 10(b), inserted by St. 1975, c. 585, § 1, provides:

> "Whoever, except as provided by law, carries on his person, or carries on his person or under his control in a vehicle, any . . . nunchaku, zoobow, also known as klackers or kung fu sticks, or any similar weapon consisting of two sticks of wood, plastic or metal connected at one end by a length of rope, chain, wire or leather . . . shall be punished."

Several dictionaries offer similar definitions.

Random House Dictionary of the English Language 1331 (2d ed. 1987) defines nunchaku as "an Oriental hand weapon for defense against frontal assault, consisting of two foot-long hardwood sticks joined by a chain or thick cord that stretches to body width."

American Heritage Dictionary of the English Language 1208 (4th ed. 2006) defines nunchaku as "[a] pair of hardwood sticks joined by a chain or cord and used as a weapon."

The trooper here made no observation of sticks.

and registration, a police officer must identify "specific, articulable facts" in support of a reasonable suspicion that an occupant of the car is involved in criminal conduct or "engaged in other suspicious conduct." *Commonwealth* v. *Torres*, 424 Mass. 153, 158 (1997), quoting from *Commonwealth* v. *Torres*, 40 Mass. App. Ct. 6, 9 (1996). See *Commonwealth* v. *Cardoso*, 46 Mass. App. Ct. 901, 901 (1998). The same objective standard governs an officer's detention and search of a person or vehicle on the belief of a danger to the officer's safety. See *Commonwealth* v. *Silva*, 366 Mass. 402, 406 (1974); *Commonwealth* v. *Cardoso*, *supra*. "A mere 'hunch' is not enough. Simple good faith on the part of an officer is not enough." *Commonwealth* v. *Silva*, *supra* (Hennessey, C.J.). Accord *Commonwealth* v. *Cardoso*, *supra*.

This case presents a classic example of a failed hunch. The linchpin of the Commonwealth's case is the reasonableness of the trooper's suspicion of the presence of the nunchuck weapon inside the car door, both as the commission of a crime (possession of a statutorily forbidden weapon) and as a threat to the trooper's safety.[3] The transcript demonstrates abundantly that the trooper never articulated a reasonable basis for so particular a suspicion. Amid the defendant's generally proper response to the trooper's stop, his earlier head dip and fidgety hands did not permit an intrusion into the car. The trooper acknowledged that, without reasonable basis for his suspicion of a concealed nunchuck, he lacked probable cause to search the car, i.e., to open the door and to reach within it. Indeed, the trooper never explained why his glimpse of a wooden or leather handle signified the likely presence of *any kind* of a weapon rather than a retractable umbrella. In these circumstances the judge correctly applied the objective standard of reasonably based suspicion and ruled that the trooper lacked justification to open the door and to proceed any further with the detention, seizure, and search of the defendant and the vehicle.[4]

---

[3]The Commonwealth never explains the motive or means by which the defendant might feasibly launch a nunchuck assault on the trooper from the interior of the car.

[4]The majority's position is that "[w]hile a mere hunch is not enough, . . . it does not take much for a police officer to establish a reasonable basis to

2. *Removal of the defendant from the car.* The motion judge reasoned that the unjustified intrusion into the car invalidated all subsequent conduct of the trooper and required the suppression of all resulting evidence. I agree. If somehow that intrusion did not violate constitutional standards, then the immediate removal of the defendant from the automobile did so. According to the majority, the trooper's discovery of the bullwhip

justify an exit order or search based on safety concerns, and, if the basis is there, a court will uphold the order. *Commonwealth* v. *Gonsalves,* 429 Mass. [658,] 664 [1999]." *Ante* at 214. The critical clause is "if the basis is there." Here the basis was a failed guess.

In contrast with this case, see the examples of "articulable facts" supporting safety concerns collected in *Commonwealth* v. *Cardoso, supra* at 902:

> "*Commonwealth* v. *Johnson,* 413 Mass. 598, 600-601 (1992) (driver put something inside his waistband after trying to evade police); *Commonwealth* v. *Vanderlinde,* 27 Mass. App. Ct. 1103, 1103-1104 (1989) (front seat passenger reached into the well between the front seats); *Commonwealth* v. *Almeida,* 373 Mass. 266, 271-272 (1977) (driver who failed to produce registration in high crime area, late at night, very careful not to open the console too wide when retrieving wallet); *Commonwealth* v. *Rivera,* 33 Mass. App. Ct. 311, 314-315 (1992) (driver had no license, police officer noticeably outnumbered, aluminum baseball bat under front passenger seat, and back seat passenger holding a large 'boom box' in which weapon could have been secreted)."

Also in *Cardoso,* the court observed that the motion judge issuing the suppression order "had the advantage of hearing the trooper's testimony." *Id.* at 901. The judge here possessed the same advantage, especially for assessing the presence of a hunch or a guess. The judge did not expressly disbelieve the trooper's subjective good faith, nor did she need to do so under the objective standard. However, this case illustrates a practical consequence of fact finding reviewed under the standard of *Commonwealth* v. *Isaiah I.,* 448 Mass. 334, 337 (2007), *S.C.,* 450 Mass. 818 (2008): "Appellate courts may supplement a judge's findings of facts if the evidence is uncontroverted and undisputed and where the judge explicitly or implicitly credited the witness's testimony."

If, as here, the only witness at a suppression hearing is the searching or arresting officer, the silence of a motion judge on the subject of the witness's credibility may invite the appellate impression of the judge's implicit acceptance of testimony. A judge disbelieving testimony, as either inadvertent error or intentional misstatement, must make the discrediting finding or risk a misunderstanding by the reviewing court. See *Commonwealth* v. *Daniel,* 464 Mass. 746, 749 (2013) (motion judge's express disbelief of police testimony of heightened awareness of danger prevents ambiguity under standard of *Isaiah I., supra*). In this instance, I view the judge's assessment of the trooper's nunchuck testimony as skeptical, but clearly sufficient under the objective standard to refute the majority's imputation of an "error of law."

rather than a nunchuck "viewed together with the defendant's pulling his right hand off the steering wheel and reaching toward his right hip as [the trooper] opened the vehicle's door . . . heightened rather than alleviated safety concerns." *Ante* at 214.

The trooper acknowledged that he immediately transferred the bullwhip from the interior floor to the roof of the car and then placed an "escort" hold on the defendant's left wrist and left upper arm and drew him out of the car. He offered two explanations for the exit maneuver. The first was that the defendant twice moved his hands off the steering wheel and on one of those occasions toward his right hip. On both occasions he returned his empty hands to the steering wheel. The second was his desire to separate the defendant from the potentially dangerous bullwhip on top of the car.[5]

Article 14 governs the use of exit orders. It "requires that a police officer, in a routine traffic stop, must have a reasonable belief that the officer's safety, or the safety of others, is in danger before ordering a driver out of a motor vehicle." *Commonwealth* v. *Gonsalves*, 429 Mass. 658, 662-663 (1999). Again, a "mere hunch" is not sufficient. "[N]or is nervousness or fidgeting on the part of the driver or passengers in a stopped vehicle an adequate reason to order them out of the car." *Commonwealth* v. *Torres*, 433 Mass. 669, 673 (2001).

Here, neither ground invoked by the trooper stands up under analysis. He conceded that on both occasions the defendant complied with his orders to return his hands to the steering wheel. On neither occasion did he see a weapon or a bulge suggesting the presence of a weapon on the defendant's person. The alleged concern about the bullwhip is improbable. Pinkham had moved it from the reach of the defendant. His removal of the defendant from the car brought the defendant closer to the object, not farther. Finally, defense counsel accurately pointed out the unlikelihood of an assault on an armed officer by a

---

[5]Trooper Pinkham testified (1) that "with the weapon in the area [bullwhip on the roof] and him moving away from me against my commands, I . . . told him to exit the vehicle, taking a hold of his left arm in an escort position"; (2) that he was wary of the defendant's possible intentions to use the bullwhip; and (3) that he was "not going to allow a person to remain free with a wing span to gain access to another weapon or item which could harm me."

bullwhip-wielding motorist.[6] The removal and the unwieldiness of the bullwhip nullified its use as a dangerous weapon. The forcible extraction of the defendant was unjustified. The evidence resulting from it requires suppression.

3. *Handcuffing and search of the defendant outside the car.* The forced removal from the car flowed directly into the handcuffing and search of the defendant. The majority characterizes those measures as "reasonable and proportional to the escalating risk [which the trooper] faced at each passing moment in this rapidly unfolding encounter," citing, inter alia, *Commonwealth* v. *Pandolfino,* 33 Mass. App. Ct. 96, 98 (1992) ("use of cuffs, if necessary to accomplish a permissible inquiry, does not convert a *Terry* stop to an arrest"). *Ante* at 215-216. I see no realistic support for that characterization in the evidence.

The trooper did not "face" an escalating encounter, he created it and then used it as justification for the cuffing and body search. During direct examination by the Commonwealth, the trooper testified that, as he removed the defendant from the car, he ordered the defendant to place his right hand on top of his head:

> "He moved his hand toward the top of his head but started tensing his left arm, and I became concerned. I placed his chest against the rear quarter panel of the vehicle, actually the window portion, and I tried to gain control of his right arm, and he was starting to pull it away from me. So I secured his left arm and pulled his right arm in as he was attempting to pull it away from me.

> "I got it behind him and I could feel that he was shak-

---

6 DEFENSE COUNSEL: "You must have had a sigh of relief that it wasn't a dangerous weapon?"

THE WITNESS: "It's a weapon. It's not a, per se, weapon but it heightened my concern that in the area of Holyoke you probably do not raise oxen or drive bull."

DEFENSE COUNSEL: "Okay. So you were concerned that [the defendant] was going to whip you with the bull whip after you took it out of the car?"

THE WITNESS: "I did not know his intentions."

ing at that time. And for my safety, I placed handcuffs on him."

*Q.*: "Okay. So he was handcuffed at this time. But you were feeling that he was tense? Is that the word you used?"

*A.*: "Correct. He did tense up when I originally was removing him from the vehicle, *and I had told him to stop resisting and relax while I was getting his right arm behind his back*" (emphasis supplied).

He repeated the substance of this testimony during cross-examination and added that his main concern was the defendant's refusal to place his right hand on top of his head.

On redirect he provided additional explanation:

*Q.*: "Why did you ask him to put his hand over his head?"

*A.*: "So I could view, and if he had complied properly with it, I could take hold of his right hand and place it behind his back."

In short, the purpose of the exit maneuver was from the beginning to place the defendant in handcuffs and frisk him. The trooper could not credibly have intended to perform the escort grapple and then leave the defendant standing unsecured outside the vehicle.

Most fundamentally he undertook this course of action still without reasonable suspicion that the defendant had committed, was committing, or was about to commit a crime; or that the defendant posed a threat to his safety, within the meaning of the stop-and-frisk doctrine of *Terry* v. *Ohio*, 392 U.S. 1, 27 (1968). When the defendant "tensed up" or held his right hand *away* from his body as the trooper forcefully maneuvered him into handcuffing position, the trooper portrayed those reactions as justification for the predetermined cuffing. See *Commonwealth* v. *Moline*, 439 Mass. 206, 210 (2003) (police cannot create the exigency leading to a warrantless arrest and then treat it as justification for the arrest). In the absence of justification for the seizure and search of the defendant and of the search of the car

as incidental to his arrest, the results of the searches are inadmissible.

*Conclusion.* The evidentiary realities of the suppression hearing present a coherent story. The encounter moved rapidly; it was not a confrontation of gradual observation and proportional judgment by the trooper. The trooper propelled the entire course of events. He possessed a hunch: in a late night civil infraction stop, he had come upon a drug dealer. Once he opened the car door, he passed beyond the point of no return in the pursuit of the hunch. He progressed through the intrusion into the car, the forcible extraction of the defendant, and the manhandling cuffing and body search. "It is apparent that [the trooper] played a good hunch and fished until he caught something." *Commonwealth* v. *Torres*, 424 Mass. 153, 161 (1997). I would affirm the order of suppression.

APPENDIX.

Excerpted direct testimony of Trooper David Pinkham during the Commonwealth's case.

*Q.*: "So after you informed him about the nature of the stop, you indicated that he provided you with a driver's license. Did he provide a registration?"

*A.*: "At that time I asked him where he was coming from. He stated he was coming from his brother's, and he was reaching over to grab the registration out of the glove box, which afforded me a view between his seat and the lower door sill of the vehicle on the driver's side, just below his left leg.

"At that time when I was looking down into the vehicle, I observed the handle of what I believed to be a nunchuck. It was, or a similar type weapon like clackers."

DEFENSE COUNSEL: "I'm sorry. I didn't hear this."

THE WITNESS: "Like clackers, nunchucks, zulu, clackers. It's the same."

*Q.*: "Based on what you thought that that was a weapon?"

*A.*: "Correct. Nunchuck is a dangerous weapon per se."

*Q.*: "Okay. That's what you believed it was?"

*A.*: "Correct. I have seen nunchucks that were fashioned similarly to the handle which I observed."

*Q.*: "Okay. What did you do at this point?"

*A.*: "At that time I instructed him to place his hands on the wheel of the vehicle. He handed me the registration and I again informed him to place his hands on the wheel of the vehicle."

*Q.*: "Why did you have to order him twice to put his hands on the steering wheel?"

DEFENSE COUNSEL: "Objection, Your Honor."

THE COURT: "If he knows why."

THE WITNESS: "I do not know the reason why I had to order him twice."

*Q.:* "What he was doing . . . ."

*A.:* "The first time I told him to do it —"

DEFENSE COUNSEL: "Your Honor, it's not a question pending."

THE COURT: "She just kind of asked him one."

DEFENSE COUNSEL: "Objection."

THE WITNESS: "The first time I asked him to, he was in the process of handing me the registration. I then got the registration and instructed him to place his hands on the wheel. So he was in the process of a movement."

*Q.:* "And the second time?"

*A.:* "The second time he did place his hands onto the steering wheel."

*Q.:* "Okay. What did you do then?"

*A.:* "At that time I told him to keep his hands on the wheel. I opened the door to the vehicle to remove the weapon from his arm span, wing span. I reached down for the vehicle — for the weapon, at which time I observed him move his right hand from the wheel, bringing it back toward his hip.

"I again told him to keep his hands on the wheel, a little firmer this time telling him not to move his hands, and to keep them on the wheel.

"I continued to view his hands while I was reaching down. I grabbed the item, started pulling it up, and he again moved his hand. I again told him to place his

hands up on the wheel. I placed the item, which turned out to be a bull whip, on the roof of the vehicle."

*Q.:* "Okay. At this point what did you do?"

*A.:* "At this point with the weapon in the area and him moving away from me against my commands, I had told him to exit the vehicle, taking ahold of his left arm in an escort position."

*Q.:* "Okay. Did he comply?"

*A.:* "He started stepping out of the vehicle. As he did so, he reached his right hand looking like he was reaching behind him. I told him to place his hand on top of his head.

"He placed his hand out to his side and up some, away from his body — that was his right hand — while I was holding his left arm. I told him again to place his hand on top of his head.

"He moved his hand toward the top of his head but started tensing his left arm, and I became concerned. I placed his chest against the rear quarter panel of the vehicle, actually the window portion, and I tried to gain control of his right arm, and he was starting to pull it away from me. So I secured his left arm and pulled his right arm in as he was attempting to pull it away from me.

"I got it behind him and I could feel that he was shaking at that time. And for my safety, I placed handcuffs on him."

*Q.:* "Okay. So he was handcuffed at this time. But you were feeling that he was tense? Is that the word you used?"

*A.:* "Correct. He did tense up when I originally was removing him from the vehicle, and I had told him to stop resisting and relax while I was getting his right arm behind his back."

*Q.:* "Okay. What happened once he was handcuffed?"

A.: "Once he was handcuffed I was checking the left handcuff for tightness making sure that I didn't clamp it down when I was placing it on quickly.

"I could see that he was trying to reach his right hand into his back right pocket away from me. I pulled his hands up and observed that he was cupping something within his right hand."

Q.: "Okay. What did you do?"

A.: "I reached his right hand. I told him to drop it. He opened his right hand at which time he dropped two packages into my hand as well as one bundle of wax paper baggies, which through my training and experience I recognized to be packaging for heroin."

Q.: "Okay. At this point what did you do after finding that contraband?"

A.: "At that point in time I read him his Miranda."