NOTICE: Summary decisions issued by the Appeals Court pursuant to M.A.C. Rule 23.0, as appearing in 97 Mass. App. Ct. 1017 (2020) (formerly known as rule 1:28, as amended by 73 Mass. App. Ct. 1001 [2009]), are primarily directed to the parties and, therefore, may not fully address the facts of the case or the panel's decisional rationale. Moreover, such decisions are not circulated to the entire court and, therefore, represent only the views of the panel that decided the case. A summary decision pursuant to rule 23.0 or rule 1:28 issued after February 25, 2008, may be cited for its persuasive value but, because of the limitations noted above, not as binding precedent. See Chace v. Curran, 71 Mass. App. Ct. 258, 260 n.4 (2008).

COMMONWEALTH OF MASSACHUSETTS

APPEALS COURT

22-P-609
22-P-1163

COMMONWEALTH

vs.

TIMMY HUNT (and a companion case[1]).

MEMORANDUM AND ORDER PURSUANT TO RULE 23.0

After their motions to suppress evidence were denied by a judge of the Superior Court, the defendants, Timmy Hunt and Daquan Dooley, both entered conditional pleas pursuant to Mass. R. Crim. P. 12 (b) (6), as appearing in 482 Mass. 1501 (2019), preserving their rights to appeal from the denial of their motions to suppress.[2] We agree with the motion judge that the Commonwealth demonstrated an adequate, race-neutral reason for

---

[1] Commonwealth vs. Daquan Dooley.

[2] Hunt tendered guilty pleas to carrying a firearm without a license, second offense, G. L. c. 269, § 10 (a), and possession of ammunition without a firearm identification card, G. L. c. 269, § 10 (h). Dooley pleaded guilty to carrying a loaded firearm without a license, G. L. c. 269, §§ 10 (a), (n), and possessing a large capacity firearm, G. L. c. 269, § 10 (m).

the motor vehicle stop that was sufficient to rebut the defendants' statistical evidence alleging discriminatory policing.  The judge also correctly found that the field interrogation and observation (FIO) statistics regarding prior stops conducted by Dunn did not preclude him from reasonably suspecting that Hunt, the registered owner of the vehicle stopped here, would also be the driver.  Finally, the exit order issued to Dooley was based on the officers' reasonable safety concerns.  Accordingly, we affirm.

Facts.  "We summarize the facts as found by the motion judge . . . supplemented by evidence in the record that is uncontroverted or that was implicitly credited by the judge," reserving certain details for our discussion of the issues. Commonwealth v. Jones, 100 Mass. App. Ct. 600, 601-602 (2022).

The defendants submitted statistical evidence from Dr. Mary Fowler, a math professor and statistician, to support their claim that two Boston police officers, Christopher Dunn and Marc McBrien, were more likely to stop Black members of the community than persons of other races.  After reviewing the material, the motion judge concluded that the defendants had made a threshold showing that race played a role in the stop and shifted the burden to the Commonwealth "to demonstrate a non-racial reason for the police officers' action in this context."  The

2

Commonwealth offered the following evidence to sustain its burden.

Officers Dunn and McBrien were partners and patrolled district B2 in Boston from 2016 until 2021.  District B2 encompassed all of Roxbury and a small part of Dorchester.  They generally worked the last-half shift from 11:45 P.M. to 7:30 A.M.  The officers distributed their time throughout B2, although they typically spent the least amount of time in Mission Hill.  Mission Hill has a large white population and there are more white people in the "Mass and Cass area."  Officer Dunn estimated that ninety-five percent of the people the officers interacted with were Black.  At times, the officers were sent by superiors on "directed patrol" for a specific area of B2, to investigate different issues such as drugs, prostitution, or shootings.

While on patrol, Dunn's procedure was to run the license plate of all vehicles he encountered unless he was out on a radio call.  If the registered owner of the car was not licensed to drive, the officers stopped the car unless they were sent to another location.

On November 26, 2018, the officers were on directed patrol in Roxbury at the intersection of Mount Pleasant and Dudley Streets because of recent gun activity in the area.  Dunn ran the license plate on his police car's computer of a car coming

3

in the opposite direction. It was dark and the officers could not see into the vehicle or see the occupants. The officers received the results of the inquiry on the license plate, which were that the car was registered to Hunt and that Hunt's driver's license was suspended. Based on this information, the officers stopped the car.

McBrien approached the driver's side of the car and Dunn walked up to the passenger side. Hunt was in the driver's seat. McBrien informed Hunt that his license was suspended, and Hunt responded that it was not suspended as he had paid fines the day before. Hunt continued to dispute that his license was suspended. McBrien explained that sometimes information does not appear in his computer immediately and he told Hunt he could look at McBrien's computer to see that it was still showing up as suspended. Hunt went with McBrien to the police car to look at the computer.

While McBrien was interacting with Hunt, Dunn requested the identification of the front passenger and of Dooley, who was in the rear seat. Dunn requested the information to determine whether either of them had a valid license and could drive the car away from the scene, as it appeared that Hunt did not have a valid license. Dunn went back to his police car to check their identifications.

4

Meanwhile, Hunt asked McBrien if he could grab his wallet. McBrien agreed, and Hunt went back to his car. McBrien expected Hunt to just get his wallet; however, Hunt sat back down into the driver's seat. At that point, McBrien became concerned that Hunt would drive away so he ordered Hunt out of the vehicle. When Hunt did not get out immediately, McBrien repeatedly told him to exit the car. McBrien saw Hunt's hand near the floorboards and saw what he believed was a gun in Hunt's hand. McBrien yelled "gun" to alert the other officers. McBrien and another officer who was at the scene grabbed Hunt, got him out of the vehicle, and located the firearm.

When Dunn heard the yelling about a gun, he got out of the police car, went back to the passenger side of the car, and told Dooley to exit. Dooley did not initially comply, so the police officers removed him from the car. Once Dooley was out of the car, officers placed him on the sidewalk to handcuff him. As they were doing so, Dunn saw that Dooley had a firearm in his waistband, which the officers confiscated.

Discussion. 1. Equal protection claim. "Equal protection jurisprudence encompasses two broad categories of rights, which protect people against selective prosecution and selective enforcement." Commonwealth v. Robinson-Van Rader, 492 Mass. 1, 16 (2023). Under the revised framework of Commonwealth v. Long, 485 Mass. 711, 724 (2020), the defendant has the burden of

5

production on a motion to suppress, to establish a reasonable inference that a traffic stop was motivated by racial bias. See Robinson-Van Rader, 492 Mass. at 17. "If the defendant's motion establishes such an inference, the defendant is entitled to a hearing, at which the Commonwealth would bear the burden of rebutting the inference." Long, supra. Here, the motion judge convened an evidentiary hearing and required the Commonwealth to establish that the stop of Hunt's car was not motivated by race.[3]

The defendants argue that Dunn's license plate query in this case was racially motivated because McBrien and Dunn primarily patrolled in majority Black neighborhoods and, based on this, were aware that most license plates they queried would be owned by Black residents and therefore their stops would be mostly of Black people. However, this effect does not establish that the practice constitutes discriminatory "selective enforcement."

"The Long test looks to the 'true' or 'subjective' motivations of the officer at the time of the stop." Commonwealth v. Stroman, 103 Mass. App. Ct. 122, 129 (2023),

---

[3] On appeal, the Commonwealth does not challenge the judge's determination that the defendants had met their burden of production pursuant to Long, but instead the Commonwealth argues that the Long analysis does not apply to the police running the license plates of cars. That argument was not raised in the trial court. Given our ultimate conclusion, we need not reach the issue or decide whether it was waived.

quoting Long, 485 Mass. at 726-727. "In examining a claim of selective enforcement, a reviewing judge must consider the totality of the circumstances surrounding the claim." Robinson-Van Rader, 492 Mass. at 20. The judge should consider the following nonexclusive factors, along with any other relevant evidence:

> "(1) patterns in enforcement actions by the particular police officer; (2) the regular duties of the officer involved in the stop; (3) the sequence of events prior to the stop; (4) the manner of the stop; (5) the safety interests in enforcing the motor vehicle violation; and (6) the specific police department's policies and procedures regarding traffic stops" (footnotes omitted). Long, 485 Mass. at 724-725.

Here, based on several factors, the motion judge concluded that the Commonwealth met its burden of showing that the stop was not racially motivated. The judge found that the officers did not know the race of the vehicle's occupants when they made the stop because they could not see inside the vehicle, and that the officers were on direct patrol and were running plates of many vehicles throughout the night. The judge further found that Officer Dunn ran Hunt's plate because it was his practice to run the plates of every vehicle he encountered while on patrol, not because he sought to target Black drivers.

The defendants do not challenge these findings but argue that statistical evidence of the demographic makeup of the neighborhood where Dunn was executing this practice suggests

7

that, even if Dunn did not know the race of the occupants of the vehicle before he ran the plate, he knew there was a high likelihood that the driver or occupants of the vehicle would be Black, and therefore it is possible to infer that Dunn's practice amounted to unlawful racial profiling. In support, Hunt cites State v. Segars, 172 N.J. 481, 496-497 (2002), for the proposition that documentary evidence can rebut an officer's claim that a stop was not motivated by race. In that case, the New Jersey Supreme Court concluded that based on the documentary evidence, the officer had "testified falsely" about his legitimate motivations for running the defendant's plate and that in fact he had unlawfully "checked [the defendant's] plate because of his race."

Here, in contrast, while the statistical evidence may suggest that the officers knew it was likely that the driver or occupants of the vehicle would be Black, the judge specifically credited Dunn's testimony that, in conducting the query and the stop, he was not motivated by an intent to target Black drivers. There is no credible evidence, as there was in Segars, that compels us to conclude that the judge's factual determination was clearly erroneous. Dunn was executing a permissible police practice of checking the plates of every car he encountered. Commonwealth v. Starr, 55 Mass. App. Ct. 590, 594 (2002) ("While random police stops of motor vehicles to check licenses and

8

registrations violate the Fourth Amendment, see <u>Delaware</u> v.

<u>Prouse</u>, 440 U.S. 648 [1979], random computer <u>checks</u> of number

plates do not").  And he was doing so in a neighborhood where he

had been directed by his supervisor to patrol for legitimate law

enforcement purposes.[4]  Based on these facts, the judge

"carefully assess[ed] the officer or officers' credibility and

determine[d] -- under the totality of the circumstances, and in

light of the factors that created the reasonable inference of

discrimination requiring an evidentiary hearing in the first

place," that the stop was made without "consideration of race"

(citations omitted).  <u>Stroman</u>, 103 Mass. App. Ct. at 132.  We

discern no clear error in the judge's factual findings or error

in his reasoning and conclusion.

2.  <u>Justification for the stop</u>.  Hunt also argues that,

notwithstanding Officer Dunn's motivation for the stop, he also

lacked the reasonable suspicion required for police to execute a

motor vehicle stop.  "To justify a police investigatory stop

under the Fourth Amendment [to the United States Constitution]

or art. 14 [of the Massachusetts Declaration of Rights], the

police must have 'reasonable suspicion' that the person has

committed, is committing, or is about to commit a crime."

---

[4] At oral argument, counsel for Hunt and counsel for Dooley
both confirmed that they are not arguing that directed patrol is
an unconstitutional police practice.

Commonwealth v. Costa, 448 Mass. 510, 514 (2007), quoting Commonwealth v. Lyons, 409 Mass. 16, 18-19 (1990). Reasonable suspicion "must be based on specific and articulable facts and reasonable inferences therefrom, in light of the officer's experience." Commonwealth v. Wilson, 441 Mass. 390, 394 (2004). In Massachusetts, "[o]peration of a motor vehicle . . . without a proper license is a violation of law and an arrestable offense" (citation omitted). Commonwealth v. Puac-Cuc, 97 Mass. App. Ct. 590, 592 (2020). Absent any contrary evidence, the police may "reasonably conclude that a vehicle is likely being driven by its registered owner." Id., quoting Commonwealth v. Deramo, 436 Mass. 40, 43 (2002).

Hunt argues that contrary evidence existed that diminished the likelihood that Hunt, the registered owner, would be the driver of the vehicle when the officers executed the stop. Specifically, he relies on statistics from Officer Dunn's prior stops. This information was drawn from FIO reports produced when a police encounter lead to "a confrontation, an arrest, [or] some kind of enforcement." Of the stops conducted by Dunn that produced an FIO report, eighty-six percent of the time the driver was not the registered owner of the car. Officer Dunn testified, however, that in many circumstances an FIO is not produced following a stop, and that of "regular car stops that I

10

do every night, I'd say eight of 10 [of the drivers] are the actual registered owner."

In Puac-Cuc, 97 Mass. App. Ct. at 593-594, we held that officers may presume that a registered owner of a vehicle is also the driver of the vehicle unless there are "facts known to the officer that would have undermined the inference that the driver was the vehicle's owner." Examples of facts that could undermine the inference would be the driver's apparent age, gender, or race not matching that of the registered owner. Here, the motion judge found that data regarding the arresting officer's personal prior experience was not enough to undermine reasonable suspicion. The judge did not err in reaching this determination, particularly where the data captured a small sample of stops, was not shown to have statistical significance, and did not account for Officer Dunn's experience executing regular motor vehicle stops that did not result in an FIO report.[5]

_____

[5] We see no merit to Hunt's argument that the stop was unduly prolonged. The officers' actions were reasonably necessary to effectuate the purpose of the stop, which was based on reasonable suspicion that Hunt was operating a vehicle with a suspended license. After Hunt argued with McBrien that his license situation was taken care of, McBrien invited Hunt to go look at his cruiser's computer to see that the system was showing the license was still suspended. Hunt agreed and it was only after he returned to the car and reached for the floorboards that the stop continued to a full-blown exit, search, and arrest. Commonwealth v. Williams, 422 Mass. 111, 118 (1996) (defendant prolonged stop by trying to flee);

3.  Exit order.[6]  An exit order is justified where "police are warranted in the belief that the safety of the officers or others is threatened" -- that is, "if officers have a reasonable suspicion of a threat to safety."  Commonwealth v. Torres-Pagan, 484 Mass. 34, 38 (2020).  "We assess 'whether there were facts and circumstances in the course of [the] particular traffic stop that, viewed objectively, would give rise to "a heightened awareness of danger" on the part of the [officer].'"  Commonwealth v. Rosado, 84 Mass. App. Ct. 208, 212 (2013), quoting Commonwealth v. Stampley, 437 Mass. 323, 326 (2002).  "[I]t does not take much for a police officer to establish a reasonable basis to justify an exit order or search based on safety concerns."  Commonwealth v. Gonsalves, 429 Mass. 658, 664 (1999).

We agree with the motion judge that the exit order issued to Dooley was reasonably based on officer safety concerns.  Dunn was in the police car verifying Dooley's and his companion's identifications when Hunt returned to his vehicle and got into the driver's seat.  Dunn saw McBrien and another officer go

_____

Commonwealth v. Ciaramitaro, 51 Mass. App. Ct. 638, 642 (2001) (stop was "[p]rolonged by the defendant's conduct, [and] the detention led to a plain-view observation of contraband weapons").

[6] The Commonwealth argues that Dooley is without standing to object to the exit order.  Because we conclude that the exit order was proper, we need not reach the standing issue.

12

headfirst into the driving compartment and saw a struggle.  He saw the officers grabbing Hunt and at approximately the same time heard both officers yelling, "gun."  As he saw this struggle, Dunn ran over to the car and ordered Dooley and the other occupant to "Get out of the car."  Dooley did not exit immediately so "he got ripped out of the car and put on the sidewalk and placed into handcuffs."  When Dooley was face down on the sidewalk, Dunn saw a firearm in his waistband, which he removed from Dooley.

A police officer in Dunn's position who saw a struggle between two officers and a driver and at the same time heard officers yelling "gun" would be warranted in believing that there was a threat to the safety of everyone at the scene. There was no error in finding that the exit order of Dooley was justified.[7]

<u>Order denying motions to suppress affirmed</u>.

By the Court (Massing, Shin & D'Angelo, JJ.[8]),

_Paul Little_

Clerk

Entered:  June 24, 2024.

---

[7] Dooley argued in his opening brief that he was unlawfully pat frisked. In his reply brief and at oral argument, however, counsel for Dooley agreed that Dooley had not been pat frisked.

[8] The panelists are listed in order of seniority.